**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**ALEXANDRIA DIVISION**

SUSTAINABLE DEVELOPMENT
RESOURCES, LLC; and QUANTUM
EARTH, LLC,

*Plaintiffs*,

v.

LOCKHEED MARTIN CORPORATION;
NIAGARA GRAVITY CONSULTING
LLC; KNIGHT AEROSPACE, LLC;
STRAIGHTLINE AVIATION LIMITED;
AT (SQUARED) AEROSPACE INC.
(D/B/A AT² AEROSPACE), DANIEL J.
DIFRANCESCO; ROBERT R. BOYD;
GRANT COOL; and BIANCA RHODES,

*Defendants*.

Civil Action No.  1:26-cv-646

**JURY TRIAL DEMANDED**

---

**COMPLAINT AND DEMAND FOR TRIAL BY JURY**

---

## <u>TABLE OF CONTENTS</u>

PRELIMINARY STATEMENT ................................................................................................. 4

JURISDICTION AND VENUE ............................................................................................... 6

PARTIES ................................................................................................................................. 12

FACTUAL BACKGROUND .................................................................................................. 25

A.    Overview of the Sovereign-Scale Commercialization and its Diversion ........................ 25

B.    Background Concerning the SDR Group and its Business Model. .................................. 28

C.    Background on Defense Offsets and Lockheed's Internal Sabotage of the UAE Deal .... 30

D.    The Airborne Platform for the Sensors. ........................................................................... 35

E.    LMC and the SDR Group Negotiate the Sale of the LMC Hybrid Airship IP ................ 39

F.    The SDR Group's Puerto Rico-Based Execution Plan and Economic Impact ................ 53

G.    The Joint Venture and Bidding Framework with Straightline .......................................... 53

H.    Defendants Divert the Hybrid Airship Opportunity and Misappropriate the SDR Group's
      Trade Secrets to Launch AT$^2$ ........................................................................................ 55

I.     Public Industry Context ................................................................................................... 58

J.     Recurring Insider-Led Commercialization Pattern (ACE, Hybrid Enterprises,
      Straightline) ...................................................................................................................... 60

CAUSES OF ACTION ........................................................................................................... 62

I.      MISAPPROPRIATION OF TRADE SECRETS Defend Trade Secrets Act of 2016
        ("DTSA"), 18 U.S.C. §§ 1831-1839 (Against all Defendants) ..................................... 62

II.     MISAPPROPRIATION OF TRADE SECRETS VIRGINIA UNIFORM TRADE SECRETS
        ACT, VA. CODE § 59.1-336 (Against Dr. Boyd, Mr. DiFrancesco, Dr. Cool, Ms. Rhodes,
        Niagara, Knight Aerospace, Straightline, and AT$^2$) ................................................. 70

III.    ACTUAL FRAUD (Against Dr. Boyd, Dr. Cool, Ms. Rhodes, Mr. DiFrancesco,
        Lockheed, Knight Aerospace, and Niagara) .................................................................. 73

IV.     BREACH OF CONTRACT CIV. COD. OF P.R., ART. 1158, 1230, 1233, AND 1255  31
        L.P.R.A., §§ 9303, 9751, 9754, 9823 (Against Niagara) ............................................... 75

V.      TORTIOUS INTERFERANCE WITH CONTRACTUAL RELATIONS (Against Dr.
        Boyd, Mr. DiFrancesco, Dr. Cool, Ms. Rhodes, Niagara, Knight Aerospace, Straightline
        and AT2) ......................................................................................................................... 77

VI.     BREACH OF FIDUCIARY DUTY (Against Dr. Boyd, Mr. DiFrancesco, And Dr. Cool)
        ....................................................................................................................................... 79

VII.    DAMAGES (Against AT$^2$, Dr. Boyd, Mr. DiFrancesco, Dr. Cool, Ms. Rhodes,  Niagara,
        Straightline, and Knight Aerospace) .............................................................................. 82

VIII.   COMMON-LAW MISAPPROPRIATION OF TRADE SECRETS Under New York Law
        (Against Lockheed) ......................................................................................................... 85

IX.    BREACH OF CONTRACT Under New York Law (Against Lockheed, Straightline, and Knight Aerospace) ........................................................................................... 87

X.    BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING Under New York Law (Against Lockheed)................................................................... 90

XI.    BREACH OF DUTY TO NEGOTIATE IN GOOD FAITH Under New York Law (Against Lockheed)........................................................................................................ 92

XII.    PROMISSORY ESTOPPEL Under New York Law (Against Lockheed)..................... 94

XIII.    UNJUST ENRICHMENT Under New York Law (Against Lockheed).......................... 95

XIV.    PERMANENT INJUNCTION To prevent any actual or threatened misappropriation of the SDR Group's Trade Secrets (Against All Defendants) ............................................. 96

PRAYER FOR RELIEF ............................................................................................................. 98

Plaintiffs, Sustainable Development Resources, LLC ("SDR") and Quantum Earth, LLC ("Quantum") (together, the "SDR Group"), by and through their attorneys, submit this Complaint against Defendants Lockheed Martin Corporation ("Lockheed" or "LMC"); Niagara Gravity Consulting LLC ("Niagara"); Knight Aerospace, LLC ("Knight Aerospace"); Straightline Aviation Limited ("Straightline"); AT (Squared) Aerospace Inc. (d/b/a AT$^2$ Aerospace) ("AT$^2$"); and Daniel J. DiFrancesco, Robert R. Boyd, Grant Cool, and Bianca Rhodes ("collectively, the "Individual Defendants"), stating as follows:

## PRELIMINARY STATEMENT

This case arises from a recurring, insider-led commercialization strategy in which Lockheed and certain legacy hybrid-airship executives repeatedly deployed competing internal approaches within Lockheed division and non-credible third-party vehicles to fabricate market demand, frustrate funded transactions, and retain or recapture control of valuable hybrid airship intellectual property. The SDR Group developed a proprietary, multi-sensor geo-surveying and logistics platform and a financing model built around government offsets. To execute at commercial scale, the SDR Group engaged Lockheed regarding Lockheed's gravity sensor systems and hybrid airship intellectual property ("LMC Hybrid Airship IP")[1]. Under proprietary information agreements with Lockheed and a paid design-review engagement, the SDR Group shared confidential technical and commercial materials (its core Trade Secrets) solely to evaluate and complete a transaction with the SDR Group. These materials included not only the SDR Group's proprietary sensor integration architecture and platform design, but also its detailed offset-

---

[1] As used herein, "Hybrid Airship" means the LMH-1/LMH-1S physical platform; "Hybrid Airship IP" means the associated intangible rights (patents, designs, data, and program intellectual property).

based commercial structure—designed to support a multi-aircraft sale to the United Arab Emirates (UAE) valued at over $3.4 billion, with global expansion prospects.

Lockheed turned that one-way street into a detour. While soliciting and accepting the SDR Group's work product, Lockheed leveraged those materials to steer the airship IP away from the SDR Group and into an insider vehicle, AT$^2$ Aerospace ("AT$^2$"), on equity/royalty terms, rather than the SDR Group's fully funded cash proposal. The insiders who helped themselves to the SDR Group's blueprint—Dr. Robert Boyd, Daniel DiFrancesco, and Dr. Grant Cool—were the very people acting as the SDR Group's trusted advisors and Lockheed's point personnel. With Bianca Rhodes and her company, Knight Aerospace, they re-papered supplier commitments that the SDR Group had assembled and positioned AT$^2$ to commercialize the SDR Group's business model. A contrived "counterbidder," Straightline Aviation, was used as cover to push the transaction off course. Lockheed's internal effort to execute this diversion—referred to as "Project Patriot"—relied heavily on RMS, AERO, and Lockheed-Corporate personnel based in Virginia, who participated in offset structuring, supplier re-alignment, and the transition of SDR Group's architecture to an insider-controlled vehicle.

The law bars exactly this conduct. The SDR Group asserts claims under the Defend Trade Secrets Act and the Virginia Uniform Trade Secrets Act, as well as claims for breach of binding confidentiality agreements, fiduciary breaches, and tortious interference arising from Defendants' misuse of protected information. Certain of those agreements are governed by Puerto Rico and New York law, and Plaintiffs seek relief under those applicable contractual and common-law doctrines as well. The proof will show that Defendants induced confidential disclosures for one defined purpose, then used those materials for another—hijacking the opportunity, sidelining the SDR Group, and launching a competing commercial path based on Plaintiffs' own platform.

Relief is both equitable and monetary. The SDR Group seeks an injunction to stop further use or disclosure of its Trade Secrets and return or certified destruction of protected materials. It also seeks restitution and damages for the lost UAE transaction, disruption of its global expansion strategy, and the non-recoverable cost of multi-year integration efforts. In short: you cannot invite a counterparty to open its books under confidentiality, accept its contractual payments, take its design and deal pipeline, and then lock it out. The SDR Group asks the Court to restore what the law and the facts require.

## JURISDICTION AND VENUE

1.      This Honorable Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332 because diversity of citizenship exists and the amount in controversy exceeds $75,000 exclusive of interest and costs.

2.      This Honorable Court also has subject-matter jurisdiction over the claims pursuant to 28 U.S.C. § 1331 as the action arises under the Defend Trade Secrets Act of 2016 ("DTSA"), 18 U.S.C. § 1836-39. The DTSA further provides that "[t]he district courts of the United States shall have original jurisdiction of civil actions brought under this section." 18 U.S.C. § 1836(c).

3.      This Honorable Court has supplemental jurisdiction under 28 U.S.C. § 1367 over the claims under the Puerto Rico Commercial and Industrial Secrets Protection Act, Act 80-2011, P.R. Laws Ann. tit 10, §§ 4131-4141; Puerto Rico General Corporations Act of 2009, Act 164-2009, P.R. Laws Ann. tit §§ 3501-4084., and the Civil Code of Puerto Rico of 2020, P.R. Laws Ann. tit. 31, §§ 6211, 6212, 9881, 9882, 10801. This is so because all claims derive from the same set of facts.

4.      This Court has personal jurisdiction over Lockheed because it transacts business in this District and committed, directed, and/or participated in acts giving rise and/or related to SDR

Group's claims in this District, including receiving, reviewing, and using Plaintiffs' confidential and trade-secret materials through personnel in Lockheed's Virginia operations.

5.     Lockheed maintains significant operations and business units across the United States, including within the Eastern District of Virginia, where it conducts international business development, offsets administration, aeronautics and systems integration functions through personnel located in or coordinating with its Arlington, Manassas, Ashburn and other Virginia facilities.

6.     This Court also has personal jurisdiction over the Individual Defendants. Upon information and belief, Dr. Boyd, Dr. Cool, and Mr. DiFrancesco regularly communicated and collaborated with, and coordinated through, Virginia-based Lockheed Martin personnel in connection with the SDR Group transaction, including Raymond P. Piselli (Vice President of Lockheed Martin International ["LMI"]), John C. Pierson (Business Development Director, RMS, operating from Manassas, Virginia), Erin R. Moseley (Vice President, Strategy and Business Development, LMC-AERO, maintaining a New Alexandria, Virginia office), Raymond C. Piselli (Corporate Development), Timothy S. Cahill (At the time, Senior Vice President of LMI – currently President, Missiles and Fire Control, maintaining an office in Arlington, Virginia), and other LMI, RMS and AERO senior staff involved in the case. These communications concerned, among other things, sensor and design studies, Lockheed project leads and governance processes, offset structuring, primary integrator designation, transaction exclusivity, supplier coordination, valuation, internal approval routing, and strategic disposition of the Hybrid Airship IP. In directing and participating in such communications with known Virginia-based executives and reporting structures, the Individual Defendants purposefully directed essential decision-making conduct into this District and availed themselves of Virginia-based corporate infrastructure.

7.      Upon information and belief, key elements of the $3.4 billion offset-backed proposal—including internal routing, evaluation, structuring, executive review, and transmission—were coordinated through Arlington, Virginia, including through Mr. Piselli and personnel operating from Lockheed Martin's Crystal Drive offices. The Individual Defendants knowingly engaged with and relied upon those Virginia-based decision-makers in advancing and later redirecting the transaction framework at issue.

8.      Mr. DiFrancesco's involvement in the SDR Group transaction was conducted through Lockheed's RMS division, including personnel and oversight operating from the Manassas, Virginia, facility located at 9500 Godwin Drive. Internal communications reflect coordination between Mr. DiFrancesco, his RMS colleagues, and Mr. Pierson regarding gravity-sensor integration and related business-development matters connected to the Hybrid Airship platform. Mr. DiFrancesco's actions were therefore undertaken in coordination with, and through, Virginia-based reporting structures and operational channels.

9.      Upon information and belief, ethics and compliance oversight relating to the transaction—including review functions associated with industrial participation, offsets, and conflict-of-interest concerns—were administered through Virginia-based personnel, including Thaddeus "Thad" Coakley, Director of Ethics and Business Conduct and Associate General Counsel, operating from Arlington, Virginia. The Individual Defendants' participation in the transaction pathway necessarily implicated and engaged these Virginia-based compliance channels.

10.     The Individual Defendants knowingly participated in a coordinated scheme with Virginia-based Lockheed Martin personnel—including Raymond P. Piselli, John C. Pierson, Timothy S. Cahill, Thaddeus "Thad" Coakley, Erin R. Moseley, and Raymond C. Piselli—who

committed overt acts within this District in furtherance of the structuring, evaluation, routing, redirection, and diversion of the Hybrid Airship IP and associated offset architecture. Each Individual Defendant knew, or reasonably should have known, that substantial acts in furtherance of the scheme would occur in Virginia, and that Virginia-based corporate personnel, approval channels, and infrastructure were being used to advance the transaction and its subsequent diversion.

11.    Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claim occurred in this District. Lockheed's RMS, AERO, and LMI divisions and other Virginia-based personnel—including individuals from its Corporate Development, International Business, Contracts, and Offsets groups—participated materially in the events giving rise to this suit. Among other things, these Virginia-based teams and individuals (a) executed and/or performed under confidentiality agreements governing the exchange of the SDR Group's proprietary information; (b) received, reviewed, and used the SDR Group's Design Review deliverables and sensor-integration concepts; and (c) engaged in internal negotiations, valuation analysis, and strategic decision-making concerning the SDR Group's proposals and Lockheed's use of the Hybrid Airship IP.

12.    Marillyn A. Hewson, then Chief Executive Officer of Lockheed and a resident of McLean, Virginia, during the relevant period, was directly contacted by UAE leadership in August 2019 regarding oversight of the SDR Group transaction and later met with UAE leadership to address the structure and status of the SDR Group offset-backed proposal. Upon information and belief, communications and executive-level coordination related to that outreach—including internal routing, escalation, oversight and economic evaluation—were conducted through

Lockheed's Virginia-based executive offices and personnel, forming part of the sequence of events underlying Plaintiffs' claims.

13.     Upon information and belief, Raymond P. Piselli—Vice President of LMI, responsible for contracts, industrial development, and offsets, operating from Arlington, Virginia—served as Lockheed's principal point person on the SDR Group offset structure following outreach from UAE leadership to Lockheed's executive office. Piselli exercised oversight over the $3.4 billion offset proposal associated with the Hybrid Airship platform and participated in internal routing, structuring, and approval of the offset-backed transaction framework at issue in this case. The evaluation, approval, and transmission of that offset structure through Virginia-based personnel constitutes a substantial part of the events giving rise to Plaintiffs' claims.

14.     John C. Pierson, Business Development Director for Lockheed's RMS division operating from the Manassas, Virginia facility (9500 Godwin Drive), participated in early-stage business development discussions concerning the SDR Group initiative and the gravity-sensor component integrated into the Hybrid Airship commercialization model. Internal communications reflect that he engaged in discussions regarding the project following meetings in the UAE. His role in Virginia-based RMS business-development coordination ties the underlying transaction pathway directly to this District.

15.     Timothy S. Cahill, Senior Vice President of LMI, maintained an Arlington, Virginia address and was included in executive-level communications concerning the SDR Group transaction during late 2019, including communications urging Lockheed to follow through on its obligations relating to the offset-backed proposal. Upon information and belief, such executive communications and related coordination occurred in part through Virginia-based offices and

personnel. His inclusion in executive correspondence concerning the $3.4 billion proposal further anchors material decision-making and oversight activity within this District.

16.    Upon information and belief, additional Virginia-based Lockheed personnel materially involved in the SDR Group transaction pathway include, *inter alia*, Thaddeus "Thad" Coakley (Director, Ethics and Business Conduct/Associate General Counsel, based in Arlington, Virginia). These individuals participated in, or exercised oversight over, internal communications, offset structuring and administration, compliance review, and business-development coordination bearing directly on the evaluation, handling, and redirection of SDR Group's confidential materials and the Hybrid Airship IP opportunity.

17.    Lockheed's personnel located in Virginia materially participated in receiving, reviewing, valuing, and reallocating SDR Group's confidential materials and trade secrets, including offset architecture and Design Review deliverables, and in decisions to divert the Hybrid Airship IP to an insider-controlled vehicle.

18.    These acts were not merely administrative; they formed a critical part of the sequence of events that caused the harm alleged in this action. The misappropriation of SDR Group's intellectual property was not a single moment of breach, but rather a progressive series of actions by Lockheed personnel—including senior personnel operating from Virginia offices— culminating in the diversion of SDR Group's IP and trade secrets to other vehicles.

19.    Venue may be proper in more than one district; Section 1391(b)(2) requires only that a substantial part of the events or omissions giving rise to the claim occurred in this District, not necessarily the majority or the most pivotal ones. The Fourth Circuit has emphasized that courts must examine the entire sequence of events underlying the claim and need not isolate only the most disputed or proximate acts. Courts in this District have repeatedly confirmed that meaningful

contributions to the underlying dispute—such as contract performance, internal negotiations, or misuse of confidential information—are sufficient to support venue.

20.       Additionally, for any defendant not resident in the United States, venue is proper in any judicial district under 28 U.S.C. § 1391(c)(3).

## PARTIES

**PLAINTIFFS**

21.       **Sustainable Development Resources, LLC**, ("SDR") is a limited liability company organized under the laws of the Commonwealth of Puerto Rico. Its offices are at 305 Ave. Constitución, San Juan, Puerto Rico, 00901-2209, and it specializes in geo-surveying and natural resource servicing.

22.       SDR has its principal place of business in Puerto Rico, and its members are all citizens of Puerto Rico.

23.       **Quantum Earth, LLC** ("Quantum"), previously d/b/a Glass Earth, LLC, is a limited liability company organized under the laws of the Commonwealth of Puerto Rico. Its offices are at 305 Ave. Constitución, San Juan, Puerto Rico, 00901-2209, and it specializes in geo-surveying and natural resource servicing.

24.       Quantum has its principal place of business in Puerto Rico, and its members are all citizens of Puerto Rico.

25.       SDR and Quantum (together, "SDR Group") own the SDR Group's Trade Secrets.

26.       SDR Group's Trade Secrets include the following discrete, interrelated categories of confidential information, each of which derives independent economic value from not being generally known and could not be readily duplicated without substantial time, cost, and access to SDR Group's internal work product: (a) Multi Sensor Integration Architecture – proprietary

engineering methods and workflows for integrating gravity, electromagnetic, and auxiliary sensors onto a hybrid airship; (b) Offset Based Valuation and Sovereign Financing Architecture – confidential methodologies for converting deployment into sovereign offset credits and multi-billion dollar valuations; (c) Supplier Stack and Execution Playbook—confidential supplier sequencing, pricing, dependency mapping, and LOI coordination; and (d) Replication and Commercialization Strategy—nonpublic playbooks for scaling the platform across sovereign customers.

**DEFENDANTS**

27.     **Lockheed Martin Corporation** ("Lockheed") is a for-profit corporation organized under the laws of the State of Maryland, with its registered office at 6801 Rockledge Dr, Bethesda, Maryland 20817. Upon information and belief, none of Lockheed's officers, directors, or members are citizens of Puerto Rico.

28.     Lockheed is an aerospace and defense company that engages in research, design, development, manufacture, integration, and sustainment of technology systems, products, and services worldwide. The company operates through four segments: Aeronautics ("AERO"); Missiles and Fire Control; Rotary and Mission Systems ("RMS"); and Space. The agreements between the SDR Group and Lockheed were entered into through Lockheed's AERO and RMS branches.[2] The RMS division maintains a major facility located at 9500 Godwin Dr., Manassas, Virginia 20110, within the Eastern District of Virginia.

---

[2] These agreements (together, the "LMC Agreements") include the following: *Proprietary Information Agreement* (# USS_2015_641) of January 6, 2016; *Amendment No. 1 to Proprietary Information Agreement No. USS_2015_641* of February 2, 2018; *Right of First Refusal Agreement for Digital Full Tensor Gradiometer* of January 31, 2019; *Commercial Services Contract* (LMH-1S-0001) of April 10, 2019; *Joint Commercialization Agreement* of 2019; *Proprietary Information Agreement* (PIA # 120637) of January 23, 2020; *Proprietary and Confidential Information Agreement* (No. 82247) of February 20, 2020.

29.      At all relevant times, Lockheed was the owner of the LMC Hybrid Airship IP, and controlled the disposition of the airship designs, patents, and related assets at issue in this case.

30.      Since 2016, Lockheed was aware that the SDR Group had proprietary multi-sensor integration methodologies and was evaluating suitable airborne platforms to house a geo-sensor suite, including Lockheed's gravity gradiometer. Although gravity sensors were the initial impetus for collaboration, the Hybrid Airship soon became central to discussions as a platform capable of large-scale geophysical surveying and logistics operations. Over the following two years, SDR Group developed the commercial and technical framework for the acquisition, development, and deployment of the LMC Hybrid Airship and its integration with gravity and other sensor systems. This evolution ultimately led to formal negotiations with Lockheed regarding the sale of sensors, Hybrid Airship IP, and related design work.

31.      During the negotiations and related discussions, members and agents of the SDR Group disclosed confidential and proprietary information to Lockheed and its employees and/or agents, including but not limited to business plans, valuation analyses, technical integration strategies, and investment structures—including sovereign offset solutions.

32.      Lockheed directly engaged in these discussions through Lockheed employees and agents who were simultaneously acting as consultants or advisors to the SDR Group, including defendants Dr. Boyd, Dr. Cool, and Mr. DiFrancesco.

33.      Upon information and belief, Lockheed later transferred the Hybrid Airship IP to a third-party entity (i.e. $AT^2$) on terms materially different from those offered to the SDR Group, including without requiring upfront compensation, and did so despite having benefited from the SDR Group's confidential materials, investment activity, and strategic modeling.

34.     **Dr. Robert R. Boyd** ("Dr. Boyd") is an individual who, upon information and belief, resides at 26011 Bellis Dr, Santa Clarita, California 91355, managed by the Robert R. & Melanie S. Boyd Trust. Upon information and belief, Dr. Boyd is not a citizen of Puerto Rico.

35.     Dr. Boyd holds a Ph.D. in Aerospace Engineering from Ohio State University, where he also served as Assistant Dean of Academic Affairs in the College of Engineering, and has over 25 years leading Hybrid Airship development and production activities at Lockheed's Skunk Works[3], including as Program Manager and Corporate Ambassador.

36.     While still employed by Lockheed, Dr. Boyd became an advisor of the SDR Group's airship business, counseling the SDR Group on how to purchase the LMC Hybrid Airship IP. In doing so, he became familiar with the SDR Group's confidential business plan, valuations and network which consisted, in part, of the know-how concerning the integration of the SDR Group's confidential geo-surveying sensors with the Hybrid Airship platform.

37.     Between 2017 and 2022, Dr. Boyd increasingly collaborated with the SDR Group in various capacities, initially leading high-level foreign dignitaries and VIP tours of Skunk Works for the SDR Group, and later actively participating in negotiations and the design processes for the SDR Group's sensor integration into the Hybrid Airship platform (i.e. the Design Review), the related offset deal with the UAE, and ultimate valuation, negotiation, and due diligence of the LMC Hybrid Airship IP.

38.     Dr. Boyd obtained full access to the SDR Group's Trade Secrets, including its confidential business information, business plan, business model, and unique technology. He assumed a front-row seat in the SDR Group's dealings and negotiation with Lockheed for the

---

[3] *Skunk Works* is the official pseudonym for Lockheed's Advanced Development Programs, responsible for a number of aircraft designs, highly classified development programs, and exotic aircraft platforms.

acquisition of the LMC Hybrid Airship IP. He also provided substantial staffing advice and facilitated introductions to key staff, including prospective hires, and advised the SDR Group in calculating and securing Lockheed's $3.4 billion offset valuation for its business model in the UAE. In that capacity, Dr. Boyd traveled to the UAE and marketed the SDR Group's business plan and technology to the SDR Group's UAE investors, including high-ranking government members, dignitaries, and officials.

39.    Dr. Boyd was aware that the SDR Group's business plan and other intellectual property were confidential and constituted trade secrets, as evidenced by his frequent use of encrypted and private communication applications (including Signal, Viber, WhatsApp, private mobile messaging, and personal email accounts) for project strategy, contractual advice, explicit criticisms of Lockheed executives (primarily reserved for Jamie Morvis, Bob Harward, Michelle Evans and Lou Smolinski) and related discussions. He also used these platforms to opine on other Lockheed team members and co-defendants in an attempt to secure the SDR Group's trust.

40.    Dr. Boyd is now a founder, President, and Chief Operating Officer of AT². On information and belief, Dr. Boyd acquired SDR Group's Trade Secrets through his dual role as Lockheed program lead and SDR Group advisor; used those Trade Secrets to structure and promote AT²'s competing business model; and disclosed SDR Group's confidential integration, supplier, and valuation materials to AT² and aligned third parties without authorization.

41.    **Dr. Grant Cool** ("Dr. Cool") is an individual who, upon information and belief, resides at 205 52225 Range Rd 232, Sherwood Park, AB T8B 1B6, Canada. Upon information and belief, Dr. Cool is not a citizen of Puerto Rico.

42.    Since 2009, Dr. Cool has been the President of Thor Aerospace, Inc. ("Thor"). For well over a decade prior to his introduction to the SDR Group, he participated in multiple

inauspicious efforts to market Lockheed's Hybrid Airship IP in various markets, including through "his company" Kivalliq Marine Exploration and India's National Remote Sensing Centre ("NRSC"), later as President and Chief Operating Officer ("COO") of Aviation Capital Enterprises Inc. ("ACE"), and later still as COO of Hybrid Enterprises ("HE"). During this period, Dr. Cool was also a consultant and subject-matter expert for Lockheed on the development of its LMH-1 Hybrid Airship final design, operations methods, and flight testing.

43.    In August 2018, Dr. Cool was introduced to the SDR Group by his "friend", co-defendant Dr. Boyd, [4] who at the time extolled the SDR Group's *"very innovative 'whole of country' geophysics survey group,"* and *"new"* and *"unique"* business plan.

44.    In a document prepared by Dr. Cool and submitted to the SDR Group on September 15, 2019—titled *Participation in Hybrid Airship Project and Industry* (hereinafter "Dr. Cool's HA Project Doc.")—Dr. Cool relayed that, up until 2018, "[i]t became very clear that no-one was willing to purchase [Lockheed's Hybrid Airship IP] until after the first certification was complete. The technology was simply too new and unproven. [HE] was shut down, and the Hybrid Airship program [at Lockheed] was all but shut down."

45.    From 2018 to 2022, Dr. Cool worked as an advisor to both Lockheed and the SDR Group—assisting Lockheed in marketing the LMC Hybrid Airship IP and the SDR Group in its efforts to purchase it. In that capacity, and with the understanding (as reflected in contemporaneous communications and conduct) that Dr. Cool would ultimately work for the SDR Group, he became privy to the SDR Group's Trade Secrets, sophisticated business plan, government and royal relationships, private equity, and offset valuations. The SDR Group arranged for and subsidized

---

[4] Dr. Boyd would later criticize Dr. Cool to SDR Group team members in an apparent effort to gain their trust. That did not stop him from later going into business with him after cutting out the SDR Group.

Dr. Cool's travel to the UAE, Canada, and the United States to help market SDR Group's business plan and placed him as project lead in the Design Review.

46.       Dr. Cool was well aware that the SDR Group's business plan and information were confidential and constituted trade secrets. He frequently used encrypted communication applications (including Signal, Viber and WhatsApp) to relay (1) explicit criticisms of the Lockheed executives mentioned above (to appear to be on SDR Group's side and gain its trust), (2) negotiation strategy, and (3) messages that, upon information and belief, were calculated to mislead the SDR Group during negotiations in order to sabotage the transaction and facilitate the misappropriation of the SDR Group's opportunity and Trade Secrets for the benefit of Dr. Cool and the other Defendants.

47.       In early 2023, Dr. Cool was reported as a founder and Chief Revenue Officer of the newly formed $AT^2$. Upon information and belief, he served as its Chief Executive Officer when Ms. Rhodes resigned from the post, notwithstanding subsequent variations in title .

48.       Upon information and belief, Dr. Cool likewise acquired SDR Group's Trade Secrets through his paid consultancy and agency relationship; used those Trade Secrets to undermine SDR Group's acquisition effort while advancing $AT^2$; and disclosed SDR Group's confidential offset architecture, supplier readiness, and commercialization strategies to $AT^2$ and its partners.

49.       **Daniel J. DiFrancesco** ("Mr. DiFrancesco") is an individual who, upon information and belief, resides at 655 Treichler Street, North Tonawanda, New York 14120. Upon information and belief, Mr. DiFrancesco is not a citizen of Puerto Rico.

50.       Mr. DiFrancesco has a bachelor's degree in mechanical engineering and served as an Lockheed employee for 32 years. He was Lockheed's Business Development Manager and

Chief Mechanical Engineer responsible for the design, integration, and testing of complex gravity gradiometer instruments for submarine navigation, arms control treaty verification, and commercial mineral and hydrocarbon exploration, among other capacities.

51.     Mr. DiFrancesco's primary area of expertise is the development of gravity geophysics sensors. While at Lockheed and thereafter, Mr. DiFrancesco acted as an advisor and confidant to the SDR Group in its efforts to (1) acquire Lockheed's Gravity sensor system, (2) acquire the LMC Hybrid Airship IP; (3) develop its business plan including offset valuation; (4) market that plan to the governments of USA, Qatar, and the UAE; and (5) finalize the Design Review and implementation by RMS.

52.     To that end, Mr. DiFrancesco was heavily involved in the creation and development of the SDR Group's sensor array for integration and use on the Hybrid Airship platform and served as Lockheed's project lead in the Design Review. Throughout this process, he obtained full access to the SDR Group's Trade Secrets, including SDR Group's confidential business information, mechanical information, business plan, business model and unique technology. Mr. DiFrancesco knew that the SDR Group's business plan and other information were confidential and constituted trade secrets. He frequently used encrypted communications applications, his personal email, and mobile telephone to relay negotiation strategy and other project communications, and to cultivate the SDR Group's trust via explicit criticisms of the Lockheed executives mentioned above.

53.     **Niagara Gravity Consulting, LLC** ("Niagara"), is a New York registered company with offices at 655 Treichler Street, North Tonawanda, NY 14120-4137. Upon information and belief, none of Niagara's officers, directors, or members are citizens of Puerto Rico.

54.     In 2021, Mr. DiFrancesco left Lockheed and founded defendant Niagara, which entered into a Puerto Rican law-governed Mutual Confidentiality and Non-Disclosure Agreement (the "Niagara NDA") with the SDR Group.

55.     Niagara and Mr. DiFrancesco served as the SDR Group's agents in developing and commercializing the SDR Group's business plan and, in that capacity, received and accessed the SDR Group's Trade Secrets pursuant to (and protected by) the Niagara NDA and related disclosures. By virtue of the Niagara NDA, Mr. DiFrancesco and Niagara understood that the SDR Group's Trade Secrets were confidential, subject to limited-use restrictions, and could not be disclosed or used for any other purpose.

56.     Upon information and belief, Mr. DiFrancesco executed another non-disclosure agreement between Niagara and $AT^2$ and currently advises or serves as a contractor for $AT^2$, assisting it in exploiting the SDR Group's Trade Secrets. Mr. DiFrancesco signed the Niagara NDA on that company's behalf. Again, as evidenced by the existence of the Niagara NDA, Mr. DiFrancesco and Niagara knew that the SDR Group's Trade Secrets constituted confidential information. Still, on information and belief, Mr. DiFrancesco and Niagara acquired SDR Group's Trade Secrets pursuant to the Niagara NDA and Design Review engagement; exceeded authorized access by using SDR Group's proprietary sensor integration and commercialization information to benefit $AT^2$; and disclosed such information to $AT^2$ despite express contractual prohibitions.

57.     Consistent with this pattern, upon information and belief, in 2023 Mr. DiFrancesco, acting in connection with $AT^2$, initiated outreach to De Beers, including contact with Project Manager Marc Lincoln, regarding $AT^2$ geo-surveying services. De Beers had previously been a gravity-sensor client during Mr. DiFrancesco's tenure at Lockheed; the solicitation of that client by a gravity specialist was consistent with the SDR Group's multi-sensor geo-survey model.

58.     **Bianca Rhodes** ("Ms. Rhodes") is an individual who, upon information and belief, resides at 7 Lazy Hollow Street in San Antonio, TX 78230. Upon information and belief, Ms. Rhodes is not a citizen of Puerto Rico.

59.     Ms. Rhodes is the President and Chief Executive Officer of defendant Knight Aerospace.

60.     **Knight Aerospace, LLC** ("Knight Aerospace") is a limited liability company organized under the laws of the State of Texas, with its registered address at 3606 SW 36th Street, Suite 101 San Antonio, Texas, 78226-4409. Upon information and belief, none of Knight Aerospace's officers, directors, or members are citizens of Puerto Rico.

61.     As Knight Aerospace's CEO, Ms. Rhodes provided design services to Lockheed and, later, led Knight Aerospace's engagement with the SDR Group during the Design Review and executed a Confirmation of Intention to Supply indicating that Knight Aerospace would partner with, develop, and supply airship crew bays to the SDR Group in May 2021. In connection with supplier diligence and design-integration work, Ms. Rhodes and Knight Aerospace received access to the SDR Group's Trade Secrets and other confidential, program-specific information under confidentiality and limited-use restrictions.

62.     Upon information and belief, Ms. Rhodes was a founder and the initial Chief Executive Officer of $AT^2$. She abruptly resigned from the post.

63.     Notwithstanding her resignation as CEO of $AT^2$, Ms. Rhodes and Knight Aerospace continue to align with $AT^2$ as corporate partners and to benefit from SDR Group's misused Trade Secrets by advising on, developing, and positioning the supply of airship crew bays for $AT^2$'s competing venture.

64.     Knight Aerospace and Ms. Rhodes acquired SDR Group's Trade Secrets through supplier diligence and Design Review participation; used SDR Group's confidential build plans and supplier stack to re paper and redirect supplier commitments to $AT^2$; and disclosed SDR Group's confidential execution materials to support $AT^2$'s competing venture.

65.      Upon information and belief, Ms. Rhodes and Knight Aerospace knew (a) the SDR Group's intended use of the LMC Hybrid Airship IP and related valuations, and (b) that $AT^2$ and insiders were misappropriating the SDR Group's Trade Secrets. Nevertheless, they leveraged access obtained through the SDR Group's supplier process and Design Review to assist $AT^2$— including by diverting cooperation and re-papering or repurposing supplier commitments for $AT^2$'s benefit—and thereby used or benefited from the SDR Group's confidential information without authorization.

66.     **Straightline Aviation Limited** ("Straightline") is a *private limited company* organized under the laws of the United Kingdom, with its registered office at Media House, Stanmore Business Park, Bridgnorth, England, WV15 5HP. Upon information and belief, none of Straightline's officers, directors, or members are citizens of Puerto Rico.

67.     During 2021–2022, Straightline positioned itself as a competing bidder for the LMC Hybrid Airship IP. Upon information and belief, Straightline acted in concert with insiders and certain Individual Defendants to advance a bid despite lacking committed financing to consummate the acquisition.

68.     On December 27, 2021, Straightline and SDR executed a *Non-Disclosure Agreement* and a *Joint Venture/Bidding Framework Agreement* (collectively, the "Straightline Agreements"), pursuant to which Straightline agreed to maintain the confidentiality and limited use of SDR Group's information and to collaborate exclusively with SDR Group in pursuing the

acquisition of the LMC Hybrid Airship IP. Under these agreements, the parties structured a coordinated joint bid and committed not to circumvent, undermine, or interfere with one another in connection with the contemplated transaction.

69.    Notwithstanding the agreements between the SDR Group and Straightline, upon information and belief, Straightline continued to engage with Lockheed and insiders as a "Dark Horse" proxy, leveraging the SDR Group's confidential diligence, supplier pipeline, and business strategy to improve its own positioning in the contemplated disposition of the LMC Hybrid Airship IP.

70.    Upon information and belief, Straightline coordinated with newly formed $AT^2$ (founded by Dr. Boyd, Dr. Cool, and Ms. Rhodes) as a launch partner, serving as a conduit to divert the opportunity away from the SDR Group and to increase bargaining leverage against the SDR Group's exclusive negotiations.

71.    Straightline purposefully directed activities toward the United States and Puerto Rico by entering into Non-Disclosure and Joint Venture/Bidding Framework agreements with the SDR Group; participating in calls, meetings, and e-mail exchanges with Plaintiffs in Puerto Rico regarding Plaintiffs' confidential technical and commercial materials; coordinating with U.S. co-defendants (including $AT^2$, a Delaware LLC) and U.S. suppliers (including Knight Aerospace in Texas); and positioning itself as an undisclosed or covert bidder in a transaction involving U.S. intellectual property owned by a U.S. company. Straightline's actions caused foreseeable injury to Puerto Rico-based Plaintiffs.

72.    Straightline acquired SDR Group's Trade Secrets through confidential diligence shared under the Straightline Agreements; knew or had reason to know the information was disclosed solely for an SDR led acquisition; and nevertheless used SDR Group's confidential

supplier pipeline, valuation posture, and transaction strategy to position itself as a proxy bidder and later align with $AT^2$.

73.    **AT (Squared) Aerospace Inc. (d/b/a $AT^2$ Aerospace)** ("$AT^2$") is a limited liability company organized under the laws of Delaware, with its registered office at 800 North State Street, Suite 304, Dover, Kent, Delaware. Upon information and belief, $AT^2$'s principal place of business is in California (where Dr. Boyd lives).

74.    Upon information and belief, none of $AT^2$'s officers, directors, or members are citizens of Puerto Rico.

75.    Through individuals who later became its founders, agents, directors and/or employees—including Dr. Boyd, Dr. Cool, and Ms. Rhodes—and Mr. DiFrancesco (via Niagara), $AT^2$ gained access to the SDR Group's Trade Secrets and other confidential information, including the SDR Group's business plan, financing and valuation strategy and technical information related to the geo-surveying sensors.

76.    Each of these individuals, and $AT^2$, knew or had reason to know that such information constituted the SDR Group's confidential and trade-secret materials and that it was disclosed subject to contractual, statutory, and common-law duties restricting use and disclosure.

77.    $AT^2$ knowingly acquired, used, and continues to use SDR Group's Trade Secrets obtained from co-defendants to replicate SDR Group's integrated technology platform, offset-based valuation model, supplier execution strategy, and sovereign commercialization plan, despite knowing the information was subject to confidentiality and limited-use restrictions.

78.    As a result, Defendants have built and marketed a venture substantially identical to the SDR Group's, including replicating the SDR Group's business strategy and valuation model

and approaching financing sources at valuations matching those the SDR Group secured, despite knowing the materials were confidential and protected as trade secrets.

## FACTUAL BACKGROUND

### A.  Overview of the Sovereign-Scale Commercialization and its Diversion

79.    The SDR Group developed a proprietary multi-sensor geosurvey and natural-resource logistics platform designed to map, quantify, and service critical mineral assets at national scale, anchored to Lockheed's non-commercial Hybrid Airship IP and related gravity sensor systems. That integrated platform was structured, funded, and formally advanced through coordinated engagements between the SDR Group and Lockheed.

80.    Over more than five years, the SDR Group worked with Lockheed as a customer and counterparty, paying for Design Review work, making Rights of First Refusal ("ROFR")-related payments, securing supplier confirmations covering substantial aircraft build components, and developing a sovereign offset architecture structured around deployment of twelve Hybrid Airships. That twelve-aircraft framework was presented in formal meetings in September 2019, including Lockheed leadership, the SDR Group, sovereign leaders, and counsel. On December 30, 2019, Lockheed Martin International (LMI) requested approximately $3.4 billion in offset credit for the first two aircraft within that twelve-aircraft program. That valuation reflected institutional modelling of the initial tranche of a program designed for national deployment and scalable replication. These activities occurred pursuant to binding confidentiality and non-disclosure agreements under which the SDR Group disclosed proprietary commercial, valuation, supplier, and integration architecture.

81.    The SDR Group's Hybrid Airship commercialization effort became a multi-divisional undertaking within Lockheed. It moved vertically and horizontally through decision-

making channels across AERO, RMS, International, and Corporate divisions. More than fifty Lockheed personnel — including senior and executive-level leadership — participated in meetings, valuation analyses, supplier coordination, internal routing, offset structuring, and strategic disposition discussions relating to the SDR Group's program. The project was handled institutionally rather than as a limited program engagement.

82.    While LMI advanced the sovereign offset structure and internally incorporated and utilized the SDR Group's offset architecture in UAE sovereign offset modelling — which was designed for scalable replication in additional jurisdictions — Lockheed's AERO contemporaneously represented to the SDR Group that the Hybrid Airship IP could be transferred through an expedited, exclusive commercial acquisition pathway distinct from LMI's offset framework, referred to internally as "Project Patriot." During this period, the SDR Group shared detailed business plans, sovereign financing confirmations, supplier sequencing, valuation modelling, and integration architecture under confidentiality protections.

83.    After several months, Lockheed transitioned Hybrid Airship IP negotiations from AERO to Corporate. Lockheed then introduced a previously unsuccessful third party, internally referenced as a "Dark Horse," as a purported counterbidder. That introduction coincided with extended delays and materially increased valuation demands. At the same time, Lockheed executives were leading parallel internal efforts concerning the disposition and retention of control over the Hybrid Airship IP while continuing to receive and internally model the SDR Group's sovereign-scale commercial framework.

84.    When the "Dark Horse" transaction did not close, the Hybrid Airship IP did not transfer to the SDR Group under the funded and structured transaction pathway. Instead, on information and belief, the IP was transferred without upfront cash consideration to a newly

formed entity, AT$^2$ Aerospace ("AT$^2$"), comprised of Lockheed executives, consultants, and suppliers — including, upon information and belief, individuals who had materially participated for multiple years in the SDR Group's confidential commercialization effort and had access to the SDR Group's protected materials.

85.    In March 2023, prior to public disclosure of the spin-off, AT$^2$ approached the SDR Group seeking a minority participation investment at a $600 million pre-money valuation — effectively proposing that Plaintiffs reinvest in the same Hybrid Airship IP through a newly formed entity at a valuation materially consistent with the sovereign-scale program Plaintiffs had funded and structured.

86.    Following SDR Group's formal demand concerning the transfer and commercialization of the Hybrid Airship IP, AT$^2$'s Chief Executive Officer resigned. During that same period, an AT$^2$ founding partner informed Plaintiffs in writing that Lockheed Martin was responsible for the transfer of the Hybrid Airship IP to AT$^2$.

87.    In May 2023, Lockheed publicly announced that the Hybrid Airship IP had transitioned to AT$^2$ through a transaction described as a Lockheed "spin-off." Upon information and belief, that transaction preserved Lockheed's financial and contractual alignment with the technology's subsequent commercialization.

88.    During this period, the entity previously referenced as the "Dark Horse" was publicly identified as Straightline Aviation Limited, which was announced as AT$^2$'s launch commercial partner. Straightline was identified as AT$^2$'s first commercial counterparty, including a reported $50 million order for the hybrid airship platform. The recurrence of the same commercial counterparty across successive iterations of the program — including its prior

introduction during the 2021 negotiation process — forms part of the sequence of events underlying the diversion of the Hybrid Airship opportunity.

89.    As described below, these events occurred after the SDR Group had funded and structured the commercialization framework underlying the subsequent $AT^2$ transaction. The SDR Group lost the opportunity to complete the sovereign-backed twelve-aircraft program it structured and funded, along with the scalable offset platform designed for replication across additional jurisdictions — a program internally modelled by Lockheed at multi-billion-dollar valuation and portfolio-scale offset impact.

**B.  Background Concerning the SDR Group and its Business Model.**

90.    The SDR Group's goal and business plan is to provide state-of-the-art, airborne, whole-of-nation, geo-surveying and related logistics services to governments and entities around the world.

91.    To conduct those geo-surveying services, the SDR Group needs to mount a multi-sensor array to an aircraft platform, which scans designated geographic areas to identify subsurface features consistent with exploitable natural resources.

92.    The SDR Group worked for multiple years to identify the optimal airborne platform to commercialize its business plan, capable of integrating its full sensor suite and supporting sovereign-scale deployment. Through that evaluation process, it identified Lockheed's Hybrid Airship platform as uniquely suited to its technical and commercial objectives.

93.    The SDR Group conceived, developed, engineered,[5] marketed, acquired intellectual property, and financed a plan to integrate its proprietary multi-sensor array with the Hybrid Airship platform to carry out sovereign-scale geophysical surveys and logistics. Through

---

[5] Through business partners it oversaw and managed.

proprietary data fusion and multi-sensor integration methodologies, the SDR Group developed the capability to generate detailed subsurface maps identifying discrete Areas of Interest ("AOIs"), meaning geographically defined subsurface zones exhibiting geophysical signatures consistent with exploitable natural resources. These AOIs formed the technical and commercial foundation of SDR Group's sovereign commercialization strategy and valuation model and constitute part of its confidential trade secrets, which it protects through non-disclosure agreements, contractual restrictions, controlled disclosures, and other reasonable measures. These methodologies and commercialization structures correspond to SDR Group's Multi Sensor Integration Architecture, Offset Based Valuation and Sovereign Financing Architecture, Supplier Stack and Execution Playbook, and Replication and Commercialization Strategy, each as defined herein.

94.     Within the SDR Group's array of sensors, it relied on Lockheed to supply one in particular: the gravity gradiometer. The gravity gradiometer sensor system is a highly specialized technology for mineral and hydrocarbon exploration, for which Lockheed is the leading manufacturer for use in mineral and hydrocarbon exploration. When combined with SDR Group's airship-mounted electromagnetic and related sensors, it enables enhanced subsurface mapping without the land degradation or infrastructure requirements associated with traditional ground surveying methods. The SDR Group developed proprietary and confidential methods and technologies to combine and interpret data from these sensors and undertook reasonable steps to protect that information.

95.     To finance this goal, the SDR Group established a structured sovereign engagement model: working with official United States Government advocacy and Department of Commerce support to negotiate directly with foreign governments to carry out aerial "whole-of-nation" surveys in exchange for back-end economic participation rights tied to resources identified through

the survey process. Under this model, governments provide funding mechanisms—including offsets, debt instruments, grants, private equity participation, and project financing—necessary to build and scale SDR Group's operations. Because SDR Group would be responsible for identifying and enabling logistical access to exploitable resources, including rare earth elements critical to U.S. supply-chain security, it anticipated long-term participation in downstream value creation aligned with United States Critical Mineral Security priorities. SDR Group structured its platform deployment model to include regional manufacturing, integration, and maintenance and repair operations in Puerto Rico, with projected large-scale U.S. job creation tied to airship production, sensor integration, logistics support, and sustainment operations. The program was designed to revitalize high-skilled aerospace and industrial capacity in Puerto Rico and support long-term domestic employment.

### C.    Background on Defense Offsets and Lockheed's Internal Sabotage of the UAE Deal

96.    Defense offsets are sovereign-imposed contractual obligations requiring major defense contractors such as Lockheed to deliver locally approved economic, industrial, or technological benefits to the purchasing nation. Offset credits—often with multiplier effects—are applied to reduce a contractor's offset liabilities, which for Lockheed spans hundreds of billions of dollars across its global defense portfolio.

97.    In 2019, the SDR Group designed a scalable, sovereign-level offset instrument anchored to Lockheed's Hybrid Airship System ("HAS") and integrated with its proprietary multi-sensor geo-survey architecture. The structure bundled aircraft deployment, sensor integration, licensing, certification, training, operations, and local joint ventures into a unified offset-clearing mechanism designed to enable sovereign customers to satisfy substantial offset liabilities—often measured in the billions of dollars—while creating long-term commercial and strategic value.

98.     In January 2019, the SDR Group secured and paid for ROFR relating to next-generation gravity gradiometer systems from Lockheed's RMS division, through Mr. DiFrancesco (Business Development Manager and Chief Mechanical Engineer, RMS) and RMS leadership in Virginia and Niagara. In April 2019, at the request of Lockheed personnel—including Raymond P. Piselli (Vice President, LMI), Shawn Racz (Industrial Participation and Offsets, LMI), and executives within AERO and RMS—the SDR Group submitted a detailed strategic white paper entitled *LMI/Glass Earth – The Ultimate Global Offset Instrument*. That paper outlined how the HAS platform (including the ROFR sensor) could be structured as a sovereign offset-backed program in the UAE capable of addressing billions of dollars in Lockheed offset liabilities and replicated across additional offset-obligor nations.

99.     The SDR Group subsequently entered into paid design work with Lockheed divisions including AERO and RMS. The SDR Group funded this work. The design effort formed the technical and commercial backbone of the HAS platform's contemplated use as a replicable offset-clearing instrument. Lockheed divisions—including LMI, AERO, and RMS—evaluated SDR's offset architecture internally, including projected credit generation, alignment with Tawazun Council industrial participation requirements, and scalability across Lockheed's offset portfolio.

100.    In August 2019, Tawazun Council[6], transmitted formal correspondence to Vice Admiral (Ret.) Robert S. Harward, then serving as Chief Executive, Lockheed Martin Middle East ("ME-CEO Harward"), and to Marillyn A. Hewson, Chairman, President & Chief Executive Officer of Lockheed. The correspondence addressed oversight and advancement of the SDR

---

[6] The Tawazun Council (formerly Tawazun Economic Council) is a UAE government entity that acts as the primary enabler for the nation's defense and security industry.

Group's Hybrid Airship offset-backed transaction and elevated the matter to Lockheed's highest executive level. Tawazun Council was unequivocally pressing Lockheed to formally commit a senior corporate authority (Raymond P. Piselli) and immediately structure the SDR Group and its UAE-AI partner Airship program under the Tawazun Economic Program—detailing divisional responsibilities in the Business Plan, and advancing it to approval under its offset obligations.

101.    In response to the August 2019 Tawazun Council correspondence, a formal meeting was convened in Abu Dhabi in September 2019 by Marillyn A. Hewson, coordinated by Shawn Racz (LMI Industrial Participation), and led by Raymond P. Piselli (LMI). Lockheed personnel—including but not limited to Dr. Boyd (Skunk Works Program Manager and Corporate Ambassador, AERO), Dr. Cool (President of Thor Aerospace), and Craig Johnson (Systems Engineer Team Lead, Skunk Works)—met with the SDR Group and UAE stakeholders, including advisors and counsel to the UAE Royal Family and officials associated with the Tawazun Council. During that meeting, a twelve-aircraft HAS program was formally presented and acknowledged as the program of record. Lockheed agreed to deliver a formal offset proposal within approximately one month and designate one Primary Integrator to oversee the program on behalf of Lockheed.

102.    Between September 23, 2019, and December 30, 2019, LMI continued advancing the offset-backed HAS program. In late December 2019—approximately 2 months after the anticipated timeline—Lockheed attributed an initial offset value of approximately USD $3.4 billion for the first two-aircraft phase (of a contemplated twelve-aircraft program) for the UAE initiative.

103.    In November 2019, while LMI remained delinquent in delivering the offset-backed structure agreed to in September 2019, personnel within Lockheed's AERO division—including

Dr. Boyd and Dr. Cool (consultant to AERO and President of Thor Aerospace)—began pressing the SDR Group to abandon the LMI-led offset commercialization track in favor of a direct "commercial deal" for the Hybrid Airship intellectual property with AERO. At the time, Dr. Boyd and Dr. Cool were simultaneously acting as advisors to the SDR Group while employed by or consulting for Lockheed. Upon information and belief, Dr. Boyd and Dr. Cool reported within AERO to Michelle Evans and Erin R. Moseley.

104.    These AERO-led discussions were internally referred to as the "Transition Project." Internal communications reflect a strategy to either secure a direct commercial agreement with AERO or, alternatively, to "'scare' [Tawazun Council] away from Hybrid Airships by saying 'there is no market' and '[Federal Aviation Administration ("FAA")] certification will be extremely difficult and expensive.'" Those communications further reflect discussions of increasing offset costs to exceed $3 billion in order to "simply make it too expensive for [Tawazun Council]."

105.    Upon information and belief, contemporaneous internal discussions within AERO—including communications involving Michelle Evans—addressed reallocating Hybrid Airship program space at Skunk Works to prioritize Lockheed's F-35 program. Internal communications further reflect that AERO did not wish to assume responsibility for executing LMI's offset-backed structure, which contemplated manufacturing and certifying SDR Group Hybrid Airships within AERO facilities. Instead, AERO discussed transitioning manufacturing and certification responsibilities to external suppliers, including Knight Aerospace, and moving the program out of Skunk Works. In parallel, AERO represented to the SDR Group that it would offer exclusivity, an expedited transaction, and a $0 IP structure. To illustrate the internal sentiment

reflected in the record, Michelle Evans was quoted during a November 2019 AERO internal meeting as stating: "no fucking way are we getting into the Hybrid Airship business."

106.    On December 30, 2019, LMI nevertheless advanced the offset-backed structure reflecting the approximately $3.4 billion valuation to UAE stakeholders. The coexistence of the LMI offset track and the AERO commercial pivot reflected internal divisional incongruity within Lockheed.

107.    In January 2020, Marillyn A. Hewson met with UAE leadership to further assess restructuring of the transaction from the previously presented offset-backed framework toward a direct commercial transfer structure involving the Hybrid Airship IP within the SDR Group's UAE partnership.

108.    Following the January 2020 executive-level engagement, AERO operationalized the commercial pivot by assigning Adnan Hiros (Engineering Project Management, Skunk Works, UAS/ISR Systems) with the objective of executing exclusivity and IP transfer to the SDR Group within months.

109.    In May 2020, Lockheed's Corporate Development function, led by Jamie Morvis (Vice President, Corporate Development), displaced AERO's commercial initiative and assumed control over negotiations relating to the Hybrid Airship IP. The transaction was assigned the internal project designation "Project Patriot."

110.    From 2020 into 2021, Lockheed required the SDR Group to continue negotiations and supplier diligence under Project Patriot, including coordination with Knight Aerospace and four other suppliers, as previously strategized by Michelle Evans.

111.    The pivot from the offset-backed sovereign framework to a Corporate Development-controlled commercial IP structure occurred after the SDR Group had funded design

work, secured ROFRs, disclosed proprietary offset architecture under confidentiality, aligned sovereign stakeholders, and relied upon Lockheed's commitment to deliver a formal offset proposal following the September 2019 meeting, , later valued by Lockheed at $3.4B for the first two aircraft phase (of a contemplated twelve-aircraft program) for the UAE program.

112.    Lockheed's internal handling of the UAE transaction—including divisional conflict between LMI and AERO, the exclusivity and intimidation strategy, F-35 program prioritization pressures, the subsequent assignment of Adnan Hiros, and the Corporate Development consolidation under Jamie Morvis—set the stage for the eventual diversion of the Hybrid Airship opportunity to insider-aligned vehicles, as described below.

**D. The Airborne Platform for the Sensors.**

113.    As mentioned above, one of the key components of the SDR Group's business was identifying and retrofitting an airborne platform capable of executing sovereign-scale geo-survey missions consistent with its sensor architecture and mission profile.

114.    Traditional fixed-wing geo-surveying aircraft (including DC-3 and DH-6 platforms) are constrained by limited range, payload capacity, altitude and climate restrictions, vibration characteristics, and electromagnetic interference—all of which materially degrade performance of sensitive multi-physics sensor systems.

115.    In around 2016, Mr. DiFrancesco, while serving in Lockheed's AERO division, presented the SDR Group with the opportunity to purchase a ROFR for Lockheed's next-generation gravity gradiometer systems. In that context, Mr. DiFrancesco confirmed with the SDR Group that Lockheed maintained a dormant Hybrid Airship program at Skunk Works and suggested that platform as potentially capable of meeting SDR Group's operational requirements.

116.    The Hybrid Airship was a Defense Advanced Research Projects Agency ("DARPA") funded vehicle designed for heavy lift, long-range cargo transport, which at the time remained incomplete and lacked a committed launch partner with verified funding.[7]

117.    The Hybrid Airship is a hybrid lifting-body aircraft combining buoyant and aerodynamic lift. Upon completion and FAA certification, the platform is capable of: (1) carrying substantial payloads for multi-day missions without the altitude, climate, vibration, and electromagnetic limitations inherent in traditional fixed-wing aircraft; and (2) vertical takeoff and landing without runway dependency or significant ground-support infrastructure.

118.    These characteristics rendered the Hybrid Airship uniquely suited to SDR Group's intended use case—whole-of-nation identification of exploitable natural resources through integrated multi-sensor deployment across geographically expansive AOIs.

119.    With DARPA funding, Lockheed developed the Hybrid Airship under the engineering oversight of Lockheed employee Dr. Boyd, with the support of various external suppliers including defendant Knight Aerospace. Lockheed subcontracted Knight Aerospace to design the gondola housing cockpit and cargo systems.

120.    Between 2010 and 2018, Dr. Cool assisted Lockheed in marketing and attempting to commercialize the Hybrid Airship concept, initially targeting U.S. military applications and subsequently cargo-specific commercial markets. Skunk Works-based teams pursued commercialization efforts through ACE and Straightline-related initiatives. Those efforts did not produce sustained market adoption, and internal concerns existed regarding the program's financial viability.

---

[7] SDR Group would rely on external supply channels under its management and supervision to complete the remaining hours.

121.    In 2018, Mr. DiFrancesco introduced the SDR Group to Dr. Boyd, who possessed direct program knowledge. At that time, AERO was exploring disposition of the incomplete LMC Hybrid Airship IP at a price reportedly below $2 million, reflecting prior unsuccessful commercialization attempts and an internal program staff of approximately three executives.

122.    SDR Group thereafter invested substantial time and resources in due diligence of the Hybrid Airship platform, including multiple SDR-sponsored visits to Lockheed's Skunk Works facility where the prototype was stored, and conducted related research and development to evaluate sensor integration feasibility.

123.    According to ME-CEO Harward, he personally verified multiple SDR Group / LMC Hybrid Airship meetings and technical tours at Lockheed's Skunk Works facility attended by U.S. Department of Commerce ("DOC") officials, UAE Royal advisers, Tawazun Council representatives, and senior Lockheed personnel including defendants Dr. Boyd, Mr. DiFrancesco, and Dr. Cool, as well as Michelle Evans (Executive Vice President, AERO), Jeff Babione (Vice President & General Manager, Advanced Development Programs, Skunk Works), Melanie Austin (Senior Manager, Strategic Sourcing—Skunk Works), John Pierson (Director, International Business Development), Craig Johnson (Systems Engineer Team Lead, Skunk Works), and Brad Baughman (Deputy Project Manager, AERO), among others. These engagements involved technical briefings, program discussions, and inspection of the Hybrid Airship prototype and related systems.

124.    Based on this diligence and the technical limitations of conventional aircraft, SDR Group concluded that the Hybrid Airship platform would materially enhance payload capacity, operational range, and data acquisition quality beyond what could be achieved with conventional survey aircraft.

125.    Following extensive diligence and repeated representations from Mr. DiFrancesco, Dr. Boyd, Dr. Cool, and Skunk Works strategic sourcing manager Melanie Austin—who were acting within Lockheed-designated roles in connection with the Hybrid Airship program—that acquisition of the LMC Hybrid Airship IP by SDR Group was achievable and supported within Lockheed, SDR Group developed a commercialization plan centered on whole-of-nation geo-surveys and logistics, and a first-mover commercial variant of the Hybrid Airship platform.

126.    That business plan anticipated that the SDR Group would over time become a highly profitable company due to its unique offering, downstream resource participation structure, and sovereign offset-fulfillment capabilities for U.S. defense primes including Lockheed—reflecting high hundreds of millions of dollars in projected equity value and billions in offset-backed program value, as modeled and exchanged among Lockheed, SDR Group, and state-level investors.

127.    During this period, Mr. DiFrancesco, Dr. Boyd, and Dr. Cool acted within Lockheed-designated roles in connection with the disposition and commercialization of the Hybrid Airship IP. Lockheed authorized these individuals to engage directly with SDR Group regarding negotiations, supplier coordination, offset structuring, and program architecture, and they participated in cross-divisional coordination among AERO, RMS, Skunk Works program leadership, and related corporate functions while serving as principal transaction interfaces with SDR Group.

128.    At all relevant times, Lockheed was aware of, authorized, and accepted the conduct of Dr. Boyd, Mr. DiFrancesco, and Dr. Cool in connection with the SDR Group transaction. Lockheed placed them in positions involving negotiation management, supplier engagement, offset modeling, and internal strategic review concerning disposition of the Hybrid Airship IP, and

senior leadership within AERO and LMI was aware of the sovereign engagement surrounding the program. Through these authorized interactions, Lockheed obtained access to SDR Group's confidential materials, offset architecture, supplier pipeline, valuation modeling, and Design Review deliverables.

129.     As a result of these engagements, SDR Group became a contracted and paying Lockheed client and commenced a formal Design Review process to integrate its proprietary sensor architecture and sovereign financing model with the Hybrid Airship platform. The technical integration work and related commercial specifications formed part of SDR Group's Trade Secrets.

130.     SDR Group's engagement generated renewed internal and external attention to the Hybrid Airship program. As previously communicated to SDR Group by Dr. Cool, prior commercialization efforts by ACE and Straightline had stalled and the program was effectively dormant by 2018.

131.     To secure its position, SDR Group paid Lockheed $500,000 in gravity gradiometer ROFR installments, invested millions of dollars as a client of AERO in Design Review execution, and millions more on offset-architecture and development—materials and work product later incorporated into Lockheed's sovereign-facing proposals, including the UAE initiative.

**E.    LMC and the SDR Group Negotiate the Sale of the LMC Hybrid Airship IP**

132.     To support the contemplated acquisition and sovereign-scale rollout, SDR Group obtained state-level sovereign backing from UAE stakeholders and aligned investment vehicles. SDR Group advised Lockheed and its representatives that SDR Group had sovereign-supported funding capacity and that SDR Group's pre-money valuation was approximately $600 million. Funding capacity was not the impediment to closing; the dispute concerns Defendants' conduct in the handling, diversion, and exploitation of SDR Group's confidential architecture and transaction

pathway. Lockheed was aware of the potential UAE funding because the SDR Group organized and led meetings between Lockheed's highest-level executives in the Middle East and the ruling members of that country.

133.     In early 2019, according to ME-CEO Harward, he was invited to a meeting in Abu Dhabi with SDR Group's CEO, leadership of an Abu Dhabi artificial intelligence (AI) and technology company ("UAE-AI Investment Vehicle"), which "focused on the Hybrid Airship concept, and the use of LM offset obligations as a funding source…." On February 23, 2019, ME-CEO Harward was summoned by a senior member of the UAE ruling family with authority over sovereign investment and offset policy (the "Senior UAE National Security Principal"), who made clear that he was "personally engaged and supportive of Quantum Earth's business and investment strategy."

134.     On March 9, 2019, ME-CEO Harward was contacted by the Legal Advisor to the Senior UAE National Security Principal, UAE-AI Investment Vehicle, and other senior members of the UAE ruling family "regarding matters relating to Quantum Earth, its UAE partnership, and its engagement with [Lockheed]." That same day, SDR Group's CEO emailed ME-CEO Harward stating that the Senior UAE National Security Principal's "mandate […] is to get the [Quantum] deal done," and attaching Senior UAE Legal Advisor's texts: "[Senior UAE National Security Principal] has asked [Senior Executive of the UAE-AI Investment Vehicle] and me to make [Quantum] deal you described and Lockheed arrangements a priority."

135.     Mr. DiFrancesco, Dr. Boyd (both still employed by Lockheed at the time), and Dr. Cool (working as an advisor to the SDR Group, but also for Lockheed) travelled on multiple occasions to the Middle East, ostensibly to help market the SDR Group's unique offering (which would benefit the SDR Group but also Lockheed). They were provided with SDR Group materials

for the limited purpose of explaining the program to sovereign stakeholders and supporting the contemplated transaction and offset framework—not to solicit, obtain, or arrange financing for the SDR Group. The confidential information included everything from the SDR Group's sophisticated and detailed business plan to the UAE offset financing deal, to the mechanics concerning the building and integration of the SDR Group's intellectual property and the Hybrid Airship. The SDR Group informed them that the information was confidential and employed mechanisms to protect it, including non-disclosure agreements.

136.    By March 2019, Lockheed—through ME-CEO Harward—was expressly on notice that SDR Group's program carried sovereign backing from the Senior UAE National Security Principal, that the Senior AI Executive and Senior UAE Legal Advisor were acting under the Senior UAE National Security Principal's direction, and that Lockheed's arrangements with SDR Group were expected to proceed.

137.    During this process, Dr. Boyd, Mr. DiFrancesco, and Dr. Cool each advised the SDR Group as to how best achieve the purchase of the LMC Hybrid Airship IP.

138.    To secure the SDR Group's trust, Dr. Boyd, Mr. DiFrancesco and Dr. Cool informed the executives of the SDR Group that specific Lockheed executives (in particular, Craig Johnson, Melanie Austin, Michelle Evans, and Jamie Morvis) were attempting to cut the SDR Group out of the deal and negotiate directly with potential investors the SDR Group had brought to the table.

139.    Nonetheless, the SDR Group was able to stave off such individualized efforts, funding was made to the SDR Group, payments were made to Lockheed, Hybrid Airship design studies commenced (i.e., the Design Review), offset proposals were submitted by Lockheed to the

SDR Group and its UAE partners, and the process for the acquisition of the LMC Hybrid Airship IP by the SDR Group ensued.

140.    On April 10, 2019, SDR Group and Lockheed executed the *Hybrid Airship Commercial Services Contract* (No. LMH-1S-0001) with a statement of work for a Conceptual Design Review to integrate SDR Group's multi-sensor array with the Hybrid Airship platform, structured as fixed-price milestone deliverables.

141.    The Conceptual Design Review was led on Lockheed's side by Dr. Boyd (LMC Hybrid Airship Program Manager), Mr. DiFrancesco (RMS Business Development Manager), and Dr. Cool (Hybrid Airship consultant). Then Lockheed-Middle East CEO, ME-CEO Harward, was notified of ongoing official SDR Group HAS meetings and tours at Skunk Works, attended by DOC officials, UAE Royals and legal advisers, Tawazun Council leadership, and Lockheed personnel (including Michelle Evans, Melanie Austin, Jeff Babione, John Pierson, Craig Johnson, and defendants Dr. Boyd, Mr. DiFrancesco, Dr. Cool).

142.    After the SDR Group secured UAE funding in June 2019, Lockheed continued negotiations with the SDR Group, including circulating proposals, developing offsets, and receiving SDR Group's confidential materials under NDA. The SDR Group invested in a business plan, financing roadmap (which included the use of 'offsets') and significant technological research and development based on its sensor array and the Hybrid Airship and gravity gradiometer, among other sensor systems—all at great expense. This yielded confidential information and trade secrets, some of which it had to share with Defendants to commercialize the product, but always under the understanding that it constituted confidential trade secrets.

143.    The SDR Group's initial proposal in the negotiations with Lockheed was that Lockheed would build and obtain certification for the Hybrid Airship, and that this would be

partially funded out of Lockheed's offset obligations owed to the investors. Lockheed spent the next six months developing their offset proposal, including funding visits by Mr. DiFrancesco and Dr. Boyd (while SDR Group paid for Dr. Cool's travel and expenses) to the UAE to assist with negotiations concerning the offset-backed program structure and transaction pathway. Lockheed's offset proposal for the Hybrid Airship project was valued in multiple billions of dollars. Lockheed agreed to undertake the work necessary to design, test, and FAA certify various variants of the Hybrid Airship, deliver the Hybrid Airship, and transfer all the LMC Hybrid Airship IP to the SDR Group within 36 months.

144.    On September 23, 2019, at Lockheed's Abu Dhabi headquarters, Lockheed "confirmed AERO as the Primary Integrator through which all LMC divisional products, including AERO's HAS and RMS's sensor suite, would flow into [SDR Group's] program," agreed to combine the AERO and RMS contracts under AERO project management, and discussed commissioning and certifying twelve LMH-1S airships.

145.    Additional components were also added into Lockheed's proposal, including pilot training, ground support equipment, field service (including an operations and support hangar large enough for two airships), and technical support from Lockheed for two years. Lockheed also proposed a high-profile announcement at EXPO 2020, for which they would deliver and assemble the Hybrid Airship (P-719) prototype for display.

146.    Consistent with SDR Group's sovereign-offset architecture, Lockheed's Vice President Raymond Piselli, together with Tim Cahill (President of LMC Missiles and Fire Control) and Dr. Boyd, presented a December 2019 Hybrid Airship plan that "ascribed a $3.4 billion" offset value to the initial UAE tranche, using Quantum's white paper as the basis for Lockheed's own submission. Lockheed's $3.4 billion valuation reflected the SDR Group's offset architecture, not

a conventional aircraft sale. By Lockheed's own approach, the UAE program's contemplated expansion to twelve aircraft and replication across additional offset-obligee nations yielded portfolio-scale offset value in the tens of billions of dollars, all arising from the SDR Group's design, disclosures, and paid program work.

147.    Dr. Boyd, Mr. DiFrancesco and Dr. Cool effectively had dual roles during this process. While they were employees (or in Dr. Cool's case, a paid consultant) for Lockheed (who placed them in this position), they also advised the SDR Group on the development of its business plan and assisted as its agents in its negotiations with Lockheed and the UAE, each of them having full access to the value of the SDR Group's unique business plan and commercialization roadmap, and being informed that SDR Group had sovereign-backed funding capacity and "pre money" valuation of approximately $600 million dollars ($780 million "post money") for the business. All of this constituted the SDR Group's protected intellectual property and trade secrets.

148.    The SDR Group and defendants Dr. Boyd, Dr. Cool, and Mr. DiFrancesco mutually assented to agency relationships pursuant to which Defendants accepted designation, acted subject to SDR Group's direction, and held themselves out to third parties as SDR Group's representatives.

149.    On July 3, 2019, the SDR Group paid Lockheed $250,000.000 as the final installment for the gravity gradiometer sensor ROFR, totaling $500,000.[8] Lockheed delivered the Design Review shortly thereafter – which, as mentioned above, was a six-month, discrete design study as to how best to integrate the SDR Group's sensor array (including the gravity gradiometer) into the Hybrid Airship platform. The specifics concerning the technology behind the sensor array and how it works, together are the SDR Group's proprietary information and trade secrets. The

---

[8] On January 31, 2019, SDR and LMC (RMS) signed the first ROFR for which the SDR Group paid $250,000.00 to LMC.

SDR Group took steps to protect this information, including the use of non-disclosure agreements. Mr. DiFrancesco and Dr. Boyd acted for Lockheed in these negotiations and design process, while Dr. Cool participated on behalf of both the SDR Group and Lockheed (who was aware of this). During this time, the SDR Group made payments to Dr. Cool personally for his expenses and he acted as the company's trusted agent.

150.    In parallel, Lockheed and SDR Group entered a Hybrid Airship Commercial Services arrangement for a six-month "Design Review" to study the integration of SDR Group's sensor array into the Hybrid Airship platform with milestone deliverables. The contract provided that specifications and data "specific to the LMH-1S Geophysics Survey Hybrid Airship design" would be the SDR Group's property. Lockheed's performance of the Design Review gave Lockheed further access to SDR Group's confidential technical integration concepts and business requirements.

151.    Knight Aerospace and Ms. Rhodes, in her capacity as CEO of Knight Aerospace and consultant and supplier for Lockheed, participated in the Design Review as per the instructions of Dr. Boyd and Dr. Cool.

152.    The result of this process and negotiations is the design for an airship multi-sensor system, which belongs to the SDR Group. The SDR Group took steps to protect it, including using non-disclosure agreements, Letters of Interest, presentations, encrypted files, encrypted software, and conference calls.

153.    Internally, certain AERO executives—most notably Executive Vice-President Michelle Evans ("AERO-EVP Evans")—took the position that Lockheed "would not build or certify" the Hybrid Airship despite the formal offer, launching a "Transition Project" and a parallel "Project Patriot" scheme to offload HAS through five outside suppliers (including defendant

Knight Aerospace) while keeping RMS to implement CODR—diverging from the commitments made to the SDR Group and Tawazun Council. According to then LMC-Middle East CEO Robert Howard, AERO-EVP Evans stated: "no f[***]ing way are we getting into the Hybrid Airship business."

154.     In early 2020, Lockheed represented that discussions were shifting towards a commercial transaction structure, whereby the SDR Group would buy the LMC Hybrid Airship IP outright from Lockheed and manufacture and certify the airship itself using a series of Lockheed-designated third parties (including Knight Aerospace). However, upon information and belief, this shift was encouraged and engineered by Lockheed personnel who sought to move the transaction away from the sovereign-backed offset framework originally endorsed by UAE stakeholders and towards a structure more favorable to Lockheed's internal strategic and financial objectives. The commercial structure reduced Lockheed's performance obligations under the offset proposal and preserved Lockheed's flexibility to redeploy or monetize the Hybrid Airship IP on alternative terms.

155.     Upon information and belief, this repositioning was not driven by sovereign preference, but by Lockheed's internal decision to retreat from the offset-backed pathway once it had obtained the benefit of SDR Group's offset architecture and valuation modeling.

156.     On January 23, 2020, SDR and LMC-RMS executed a *Proprietary and Confidential Information Agreement* (PIA #120637). On February 20, 2020, Quantum and LMC-AERO executed a *Proprietary and Confidential Information Agreement* (No. 82247).[9] Under these agreements the parties agreed to exchange non-public technical and business information "for the protection, use and disclosure of Proprietary Information" solely to evaluate SDR Group's

---

[9] Together, the "SDR Group-LMC PIAs".

acquisition of the Hybrid Airship IP, with confidentiality markings and handling protocols. Lockheed acknowledged that information relating to SDR Group's multi-sensor platform, business model, and financing plan would be treated as confidential and used only for the stated purpose.

157.    On information and belief, Lockheed personnel—including personnel working from RMS' office building in Manassas, Virginia—administered, received, and used SDR Group's confidential materials under the PIA and during the Design Review, including review of sensor-integration concepts and platform configurations.

158.    Lockheed received extensive SDR Group confidential materials under the SDR Group-LMC PIAs, including: (i) sensor-integration concepts and platform configurations; (ii) SDR's business plan, valuation and financing roadmap (including offset structures); and (iii) supplier pipeline and letters of intent. These materials were marked or communicated as confidential and exchanged in reliance on the SDR Group-LMC PIAs' obligations.

159.    Shortly thereafter, Dr. Cool—then working on Lockheed's Hybrid Airship program—wrote to the SDR Group to request that his relationship with the SDR Group be further documented so that he could *"share the decade of IP he's holding [...] without recourse from [LMC],"* underscoring that the ongoing diligence and information exchanges were occurring under, and in reliance on, the SDR Group-LMC PIAs.

160.    All parties, including Lockheed, understood that Dr. Cool, Dr. Boyd, and Mr. DiFrancesco would join the SDR Group following its acquisition of the LMC Hybrid Airship IP. At the time, these individuals remained employed by Lockheed and acted on its behalf in executing the transaction. Lockheed directed and authorized their engagement with the SDR Group and was fully aware that it positioned them to facilitate the sale and appear as part of SDR Group's leadership post-acquisition. Accordingly, with Lockheed's knowledge and approval, all three

individuals provided their resumes to the SDR Group and agreed to be included in its masthead as part of SDR Group's prospective acquisition team.

161.    The SDR Group continued to share its confidential information with them as needed, under the understanding that it was indeed confidential and protected. At the end of the day, this was only natural given all three were meant to soon begin to work for the SDR Group.

162.    In the first and second quarters of 2020, the SDR Group's starting point for the LMC Hybrid Airship IP was a bid of $1.5 million dollars.

163.    An extended period of negotiation and due diligence ensued. That process was repeatedly delayed by frequent changes in Lockheed's designated executives responsible for the Hybrid Airship IP disposition; a high-level diplomatic visit by Lockheed CEO Marilyn Hewson with head-of-state officials from the UAE (the SDR Group's principal investor)[10]; the onset of the COVID-19 pandemic; and, behind the scenes, a pattern of misconduct by individuals within Lockheed who, while acting under color of corporate authority, began subverting the transaction process for undisclosed purposes:

    a)  Upon information and belief, Dr. Boyd and Dr. Cool—while acting in their capacities as Lockheed employees and representatives—exploited the SDR Group's years of cultivated goodwill, its substantial payments to Lockheed for the Design Review and ROFR rights, its business plan, Lockheed's multi-billion-dollar offset valuation based on SDR Group's offset architecture, and the SDR Group's access to state-backed investor funding. Under the guise of facilitating the transaction, they introduced the

---

[10] In communication from January 8, 2020, Dr. Boyd represents that then-LMC CEO Marilyn Hewson's meeting with UAE leadership was intended to assess senior UAE officials' position regarding a potential shift from an offset-structured transaction to a direct sale of the Hybrid Airship IP. LMC communicated that the outcome of that executive-level discussion would inform next steps in the SDR Group's negotiations. The timing and use of this CEO-level engagement affected the pace of the ongoing IP discussions.

threat of a competing phantom bidder for the purpose of gradually inflating the SDR Group's offer (the only one supported by proof of funds), whilst simultaneously exhausting the LMC Hybrid Airship IP transfer process within Lockheed's Corporate Development division. This conduct—undertaken on Lockheed's behalf and with Lockheed's knowledge or willful disregard—ultimately positioned the Hybrid Airship IP to be diverted for the benefit of Dr. Cool, Dr. Boyd, and other insiders, and to the detriment of the SDR Group.

b) While formally tasked by Lockheed with overseeing the Hybrid Airship IP disposition process, Dr. Boyd and Dr. Cool repeatedly provided the SDR Group with proposed contractual language and strategic "advice" concerning the LMC Hybrid Airship transaction. Simultaneously, they disparaged their own colleagues in Lockheed's Corporate Development division—including Jamie Morvis—via private Gmail accounts, text messages, and encrypted communications applications. These communications were designed to cultivate trust with the SDR Group and position themselves as independent allies, all while operating under Lockheed's authority. Upon information and belief, Lockheed either knowingly permitted or willfully ignored this conduct, enabling Boyd and Cool to manipulate both sides of the negotiation and steer the transaction toward an outcome that served their own interests and those of affiliated insiders.

164.    By July of 2020, the SDR Group had been informed that the unnamed phantom bidder (later revealed to be Straightline) had matched the SDR Group's offer for the LMC Hybrid Airship IP.

165.      Dr. Boyd and Dr. Cool—still acting as Lockheed's representatives for the transaction—urged the SDR Group to increase its offer to Lockheed. They first encouraged the SDR Group to raise its bid to $3 million in cash plus over $30 million in royalty payments. Then, in August 2020, they proposed a revised structure: $20 million in cash and $500,000 in royalties per airship, bringing the total transaction value to over $50 million—all for the incomplete Hybrid Airship IP. Despite the mounting demands, the SDR Group reaffirmed its commitment and submitted updated proof of funds to Lockheed on September 24, 2020.

166.      Five months later, on February 16, 2021, during which period Lockheed was apparently researching and indeed confirmed the SDR Group's proof of funds in the UAE, Jamie Morvis represented via e-mail that Lockheed would provide the SDR Group an exclusivity period with extensions as needed to *"get to a deal close"* under which Lockheed would *"not proceed with a sale of the [Hybrid Airship] IP"* to any other party while the SDR Group completed diligence and markup of the draft *Asset Purchase Agreement* ("APA").  In reliance on Lockheed's representations and confidentiality obligations, the SDR Group returned its APA markup on February 22, 2021.

167.      Upon information and belief, it was at this time that Dr. Boyd and Dr. Cool realized that their plan to steal the SDR Group's business was slipping away and stepped up their efforts to weave their long-time associates at Straightline into a more competitive (albeit entirely financially unsubstantiated) counterbid for the LMC Hybrid Airship IP.

168.      Upon information and belief, while serving as Lockheed's designated project lead for the Hybrid Airship transaction—and with the knowledge, endorsement, or willful disregard of senior Lockheed decision-makers—Dr. Boyd actively disrupted the SDR Group's supply-chain due diligence process. At the same time, he covertly positioned Straightline as a purportedly viable

alternative counterparty, thereby steering Lockheed's IP disposition efforts away from the SDR Group's verified and fully funded offer.

169.    On March 4, 2021, Jamie Morvis formally positioned Dr. Boyd as the gatekeeper to supply-chain, stating: *"We would agree to facilitate ASAP through Dr. Boyd diligence discussions regarding the program supply chain (costing, availability and subcontracting model) as well as allow for engagement with key suppliers regarding confirmatory proposals regarding your business plan."*

170.    In truth, Dr. Boyd was not acting in good faith. Upon information and belief, while serving as Lockheed's designated facilitator for the SDR Group's offer —and with Lockheed's knowledge, acquiescence, or reckless disregard—Dr. Boyd intentionally weaponized Lockheed's institutional authority and internal processes to advance Straightline's unsubstantiated bid. This coordinated conduct deployed Lockheed's negotiation position and leverage to mislead the SDR Group and reroute the transaction to benefit insiders and Lockheed itself, rather than fairly adjudicate SDR Group's fully-funded proposal.

171.    A month later, on April 26, 2021—using his personal Gmail account rather than his Lockheed e-mail—Dr. Boyd told the SDR Group that the "Dark Horse"[11] had scheduled its first meeting with Lockheed's AERO Division for the week of May 3, 2021, and that Jamie Morvis was pushing to complete all the SDR Group's supplier meetings (including Knight Aerospace) prior to that meeting. Dr. Boyd stated that Jamie Morvis wanted the SDR Group deal done "ASAP" but worried the "Dark Horse" might "upset his apple cart."

---

[11] *"Dark Horse"* was the term Dr. Boyd used to refer to the other bidder when discussing the situation with the SDR Group, so as to conceal Straightline's identity.

172.     Following Straightline's meeting with Lockheed's AERO Division, it is now known that with the support and encouragement of Dr. Boyd and his fellow conspirators, Straightline submitted a $25 million bid to Lockheed. Upon information and belief, the purpose of this bid was to derail the SDR Group's guaranteed offer, knowing intimately that the impecunious Straightline had zero financial wherewithal to follow-through on such a bid.

173.     Again, playing both sides, to keep the SDR Group in place, Dr. Boyd and Dr. Cool represented that, if the competing "*Dark Horse*" deal did not materialize, Lockheed would naturally revert to the SDR Group's fully funded $20 million bid. The SDR Group relied on those assurances by forgoing further escalation and continuing to cooperate.

174.     It is now known that, with the support of Dr. Boyd and Dr. Cool, Lockheed granted Straightline a 6-month exclusivity period to purchase the Hybrid Airship IP—even though Straightline had failed to present proof of funds or satisfy Lockheed's own stated requirements. This decision, made with full awareness of the SDR Group's existing interest and documented capacity to perform, further underscores Lockheed's complicity in sidelining the SDR Group in favor of insiders.

175.     In fact, as Straightline's exclusivity period drew to a close—in late 2021—Straightline solicited the SDR Group's chairman in London to fund Straightline's acquisition of the LMC Hybrid Airship IP.

176.     ME-CEO Harward identifies Lockheed Corporate Development leadership[12] from AERO, RMS, and LMI as the locus of discoverable official and unofficial communications evidencing the diversion and insider coordination.

---

[12] Including but not limited to "Raymond Piselli, Michelle Evans, Tim Cahill, Melani Austin, Bob Boyd, Dan DiFrancesco, Shaw Racz, John Pierson, Jamie Morvis."

177.     Straightline kept the SDR Group busy with deal negotiation and alternative Hybrid Airship IP due diligence, while Dr. Boyd, Dr. Cool, and Ms. Rhodes quietly negotiated a sweetheart deal with Lockheed for $0; all the while misleading the SDR Group that Lockheed would return to their $20M offer. Once AT$^2$'s deal was locked, Dr. Boyd attempted to sell the SDR Group a minority stake at a $600 million pre valuation.

### F.  The SDR Group's Puerto Rico-Based Execution Plan and Economic Impact

178.     From the outset, the SDR Group's strategic vision included leveraging Puerto Rico as the centralized manufacturing and integration site for the Hybrid Airship program. Both SDR and Quantum Earth are Puerto Rico-based entities. The program contemplated assembling Hybrid Airship components on the island for global deployment, resulting in substantial investment, job creation, and industrial development within Puerto Rico.

179.     To this end, the SDR Group had engaged in longstanding discussions since 2019 with multiple Puerto Rico government and industrial stakeholders, including the Puerto Rico Industrial Development Company ("PRIDCO"), Department of Economic Development and Commerce, Puerto Rico Electric Power Authority ("PREPA"), Roosevelt Roads Redevelopment Authority, Polytechnic University, Ports Authority, the Aerospace + Technology Cluster, and the Aerospace Technology Consortium.

### G.  The Joint Venture and Bidding Framework with Straightline

180.     Upon information and belief, Dr. Boyd and Dr. Cool—acting as advisors of the SDR Group in the potential acquisition of the Hybrid Airship IP—were simultaneously engaged in negotiations with Lockheed regarding the same asset. They informed the SDR Group that Lockheed was in discussions with an unnamed third party and encouraged the SDR Group to increase its offer to remain competitive.

181.     Relying on these representations, and unaware of the undisclosed conflict of interest, the SDR Group increased its bid in good faith, ultimately offering $20 million in cash and royalty terms exceeding $30 million. However, when Dr. Boyd and Dr. Cool later claimed that the unnamed bidder was offering $25 million, the SDR Group declined to raise its bid further without transparency regarding the competing offer's legitimacy.

182.     The SDR Group subsequently discovered that the so-called competing bidder was Straightline—an unfinanced company that had previously failed to market and sell the Hybrid Airship in 2016, and whose leadership had longstanding ties to Dr. Boyd and Dr. Cool. This revelation made clear that while Dr. Cool and Dr. Boyd were ostensibly supporting SDR Group's negotiations, they were concurrently advancing the interests of an insider-aligned, unqualified alternative. Their "advice" was not only conflicted, but strategically harmful to SDR Group's position—an effort to weaken SDR Group's leverage while enabling Straightline's ascension.

183.     To eliminate the destructive bidding dynamic they had orchestrated, Dr. Boyd and Dr. Cool then facilitated a détente between the SDR Group and Straightline. The two companies executed a Non-Disclosure Agreement and a Joint Venture/Bidding Framework agreement in late 2021 and early 2022, pursuant to which the parties agreed to pursue a coordinated acquisition strategy, collaborate exclusively in connection with the LMC Hybrid Airship IP, and refrain from undermining or circumventing one another in the contemplated transaction. These agreements were premised on the assurance—communicated by Dr. Boyd and Dr. Cool—that Straightline would serve as SDR Group's operations partner once SDR Group acquired the Hybrid Airship IP.

184.     Having accepted this structure in reliance on the assurances provided, the SDR Group refrained from further competitive escalation, declined to pursue alternative acquisition pathways, and structured its negotiations under the agreed coordinated framework with

Straightline. Dr. Boyd and Dr. Cool repeatedly reaffirmed that Lockheed would soon re-engage with SDR to finalize the transaction. Trusting those assurances and unaware of the behind-the-scenes diversion already underway, SDR waited—maintaining financing readiness, supplier alignment, and transaction posture in accordance with the joint framework—while Lockheed, in concert with its insiders, maneuvered to reassign the Hybrid Airship IP elsewhere.

### H. Defendants Divert the Hybrid Airship Opportunity and Misappropriate the SDR Group's Trade Secrets to Launch AT²

185.     While the SDR Group awaited the promised reengagement from Lockheed, and under the false impression that a deal was forthcoming, Lockheed insiders and their associates were covertly orchestrating a scheme to seize control of the Hybrid Airship platform, sideline the SDR Group, and exploit its proprietary business model, technical designs, and economic structure for their own benefit.

186.     Unbeknownst to the SDR Group, in the second half of 2022, Defendants Dr. Boyd, Dr. Cool, and Ms. Rhodes formed AT² Aerospace ("AT²"), a newly created entity designed to acquire and commercialize the Hybrid Airship IP that SDR Group had spent years developing, structuring, and financing in partnership with Lockheed. The formation of AT² was the culmination of a sustained, deliberate effort to usurp the SDR Group's offset-based commercialization model, divert the IP away from its rightful acquirer, and replicate the SDR Group's confidential multi-sensor airship platform under a new banner.

187.     Despite the SDR Group's contracts, verified UAE funding, and senior-level sovereign directives supporting the transaction, certain senior managers, engineers, and consultants within Lockheed engaged in conduct aimed at preventing the SDR Group from acquiring the Hybrid Airship IP. Upon information and belief, these individuals pursued a strategy to position themselves or insider-aligned entities to acquire the Hybrid Airship IP from Lockheed

at a fraction of the SDR Group's verified offers and thereafter monetize or resell that same IP—as a new company—at the same SDR Group's valuation. These actions unfolded despite the SDR Group's confirmed funding capacity, ongoing royalty negotiations, letters of intent with suppliers, and senior-level approvals from Lockheed leadership and UAE authorities. The result was the covert transfer of the Hybrid Airship IP to $AT^2$—a transfer executed with Lockheed's knowledge and participation and structured to preserve Lockheed's ongoing economic interest in the technology, including retained ownership and royalty rights.

188.    According to public reports and Dr. Boyd's own admissions, Lockheed transferred the Hybrid Airship IP to $AT^2$ with no upfront consideration and in exchange for a 5% equity stake and a royalty arrangement.[13] This occurred while SDR had an active, fully funded $20 million offer on the table and had already invested millions into the design platform, supplier engagement, and offset structuring that made the opportunity commercially viable.

189.    When SDR Group confronted Dr. Boyd in March 2023 about rumors that he had acquired the IP, he responded with what he described as "great news": that he, Dr. Cool, and Ms. Rhodes had formed $AT^2$ and acquired the Hybrid Airship IP "free and clear." He encouraged SDR Group— since it owned the *"multi-physics IP outright"*—to invest in the new venture at a $600 million valuation (the same valuation SDR Group had generated based on its own business plan) and sent a draft *Non-Disclosure Agreement* that would allow SDR Group to view details of the Hybrid Airship IP transfer. SDR Group declined to sign.

190.    $AT^2$'s post-transfer conduct makes plain its intent to copy the SDR Group's business model. Mr. DiFrancesco, the principal of Niagara—a sensor integrator under NDA with

---

[13] *See* Graham Warwick, *Hybrid Airship Handover*, AVIATION WEEK & SPACE TECHNOLOGY, October 30-November 12, 2023.

the SDR Group—was brought in to assist AT$^2$ despite having no expertise in aeronautics or cargo logistics.[14] His value lay exclusively in SDR Group's trade-secret sensor integration platform, which AT$^2$ now intended to reproduce. DiFrancesco admitted he was aware of the AT$^2$ transaction but was bound to silence due to a subsequent NDA signed with AT$^2$.

191.    In spring 2023, the SDR Group learned that AT$^2$ had approached executives at DeBeers[15] to promote the "multi-physics" geo-surveying capabilities of the Hybrid Airship—precisely the SDR Group's trade-secret platform. Simultaneously, AT$^2$ began seeking capital at the same $600 million pre-money valuation that the SDR Group had anchored to its commercial rollout plan. That valuation is unjustifiable for a pure cargo platform, which Lockheed itself had failed to market for over a decade, but it aligns precisely with SDR Group's sensor-based, offset-leveraged business model and the downstream resource-extraction potential.

192.    In parallel, AT$^2$ began claiming SDR Group's supply chain relationships as its own. Lockheed and AT$^2$ now publicly assert that supplier agreements once tied to SDR Group are under AT$^2$'s control. Upon information and belief, Lockheed transferred not just the Hybrid Airship IP but SDR Group's design work, supplier pipeline, and project deliverables—including those resulting from paid design work and sensor ROFRs—to AT$^2$, despite SDR Group's contractual rights and exclusivity discussions.

193.    Defendants had direct access to the SDR Group's Trade Secrets, business model, technical schematics, and supply chain. Upon information and belief, they exploited this access by forming a new venture that now mirrors SDR Group's confidential business structure in nearly

---

[14] Mr. DiFrancesco's inclusion underscores AT$^2$'s intent to commercialize SDR Group's offset-enabled geo-surveillance model, not a generic cargo venture. No plausible rationale exists for Mr. DiFrancesco's role except to leverage SDR Group's proprietary survey architecture.

[15] De Beers Group is a British multinational corporation engaged in diamond exploration, mining, and trading, with a long-standing interest in advanced mineral surveying technologies.

every respect. Defendants were also aware of the letters of intent between SDR Group and its suppliers and appear to have duplicated these letters for $AT^2$. These actions constitute not just misappropriation but active conspiracy to dismantle and replace the SDR Group's venture.

194.     Straightline—previously used as a contrived "Dark Horse" counterbidder during Lockheed negotiations—also played a role. After entering Joint Venture and Bidding Framework agreements with SDR Group to avoid undermining the deal, Straightline later realigned with $AT^2$ and is now positioned within its commercial orbit, lending further evidence of pretext and collusion.

195.     The result is catastrophic: SDR Group lost its opportunity to acquire the Hybrid Airship IP it designed, financed, and operationalized; lost its Puerto Rico-based execution plan, supplier contracts, and design outputs; and now faces competition from a clone company that exists only because of SDR Group's own confidential disclosures. All of this occurred while Lockheed, acting through its representatives, knowingly sanctioned and facilitated the transfer.

## I.  Public Industry Context

196.     Contemporaneous industry reporting reflected that Straightline's involvement in the hybrid airship program consisted of a non-binding letter of intent and that the company was still awaiting binding end-user commitments, while development milestones were repeatedly delayed. Subsequent public coverage continued to associate Straightline with the hybrid airship platform and later with $AT^2$.

197.     From 2015 through 2023, Lockheed and its affiliates publicly promoted the LMH-1 Hybrid Airship as a near-ready platform for commercial and humanitarian missions. In March 2016, Lockheed announced Straightline had signed a non-binding Letter of Intent for up to 12 LMH-1 units, which was widely cited in aerospace publications as early validation of market

demand. *See* Terry, *Lockheed Martin P-791*, ALL-AERO (Feb. 9, 2025), https://all-aero.com/2025/02/09/lockheed-martin-p-791/.

198.     Years later, Straightline resurfaced in aviation press with reports of a $50 million order—this time for hybrid airships from AT² Aerospace—described as a major investment in the commercial potential of the platform. *See* Sam Allcock, *COVERAGE: BusinessMole - Straightline Aviation Invests $50 Million in Pioneering Hybrid Airship Technology*, STRAIGHTLINE AVIATION (March 5, 2025), https://www.straightlineaviation.com/news/coverage-businessmole-straightline-aviation-invests-50-million-in-pioneering-hybrid-airship-technology.

199.     Despite this public narrative, Lockheed encountered persistent delays and difficulties in executing the LMH-1 program. Key milestones were repeatedly missed, and the platform's "float-out" was pushed beyond 2019. *See* Howard Slutsken, *LMH-1 Hybrid Airship "Float-Out" Pushed to 2019*, SKIESMAG (2017), https://skiesmag.com/news/lmh-1-airship-float-pushed-2019/.

200.     In May 2023, Lockheed announced that it had officially transferred the LMH-1 and its associated IP to AT² Aerospace, a newly formed company led by Lockheed program Manager Dr. Boyd. Lockheed described the move as an opportunity for AT² to continue developing hybrid airships for "commercial and humanitarian applications around the world." *Hybrid Airship Enters the Transfer Portal*, LOCKHEED MARTIN (May 9, 2023), https://news.lockheedmartin.com/2023-05-09-Hybrid-Airship-Enters-the-Transfer-Portal.

201.     These public-facing developments painted a picture of a robust, evolving commercialization effort. However, the original airship platform had failed to secure firm commitments, and the transition to AT² followed years of internally acknowledged market failures and stalled execution.

**J. Recurring Insider-Led Commercialization Pattern (ACE, Hybrid Enterprises, Straightline)**

202.     Lockheed's history with hybrid airship commercialization reflects a recurring pattern: development and investor engagement led by Dr. Boyd and his Skunk Works team, followed by insider-aligned vehicles taking over IP positioning and external interface. In each instance—from ACE to Hybrid Enterprises to Straightline—the cycle reveals how Lockheed preserves control while distancing itself from commercial risk, then resets the narrative following program setbacks.

203.     The first major attempt was Aviation Capital Enterprises (ACE), a Canadian company that entered into a Hybrid Airship Development Agreement (HADA) with Lockheed from 2010 to 2013. ACE's leadership included Grant Cool (President/COO) and Brendan Panda of Evercore Inc.[16], who served as ACE's principal advisor for the HADA transaction and broader funding strategy. ACE financed completion of the *Skytug* airship (later LMH-1) and held rights to commercialize the platform. The smaller Skytug model was chosen following ACE's market studies and Lockheed's FAA interactions. Ultimately, the HADA between ACE and Lockheed collapsed after ACE's primary investor (Emirates Associated Business Group of the UAE) was implicated in arms-trade violations involving Syria, prompting Lockheed to terminate the agreement for cause. Mr. Cool remained the only legacy participant from the ACE effort, retaining access to ACE documents and continuing to advise Dr. Boyd's team even after the company's dissolution.

---

[16] Evercore is a global independent investment banking advisory firm that served as ACE's financial advisor during the negotiation of the HADA with LMC and in its efforts to secure long-term funding, including potential initial public offering ("IPO") options. Evercore's role underscores the level of institutional structuring contemplated for the ACE–Lockheed commercialization model, in contrast to the later insider-managed vehicles with no comparable financial credibility.

204.    The second effort was Hybrid Enterprises ("HE"), formed by Lockheed in 2015 as a wholly controlled commercialization vehicle. HE was staffed by Mr. Cool, who had worked under contract with Lockheed since 2014 as a subject matter expert. HE was tasked with securing orders for 12 LMH-1 units within 18 months, later reduced to a lower target. Despite Mr. Cool's outreach to over 100 potential customers and international presentations, HE secured no sales—largely due to market hesitance over FAA certification. Lockheed shut HE down in 2018, scaling down the development team accordingly.

205.    Shortly thereafter, Lockheed personnel, including Dr. Boyd and Dr. Cool, became involved with Straightline, a UK-based company positioning itself as a commercial hybrid airship operator. Though formally separate, Straightline relied on inside access to Lockheed technology and team members to solicit preorders and market the LMH-1 platform. In or about 2020, after SDR Group's negotiations with Lockheed approached critical IP transfer stages, Straightline reemerged—again promoted as a major purchaser—despite its history of failed funding and inability to close binding agreements.

206.    This pattern—internal development followed by deployment of external vehicles with insider ties—set the precedent for the later misappropriation of the SDR Group's commercial opportunity and diversion of the Hybrid Airship platform to insider-aligned entities. This pattern culminated in the formation of AT$^2$ Aerospace in 2022, a Lockheed-connected entity controlled by Dr. Boyd, Grant Cool, and others, which received the hybrid airship IP without consideration—effectively bypassing SDR Group and locking out a credible, government-supported transaction led by SDR Group.

## CAUSES OF ACTION

### I.    MISAPPROPRIATION OF TRADE SECRETS
### Defend Trade Secrets Act of 2016 ("DTSA"), 18 U.S.C. §§ 1831-1839
### (Against all Defendants)

207.    Plaintiffs reallege and incorporate by reference the allegations set forth in the preceding paragraphs as if fully set forth herein.

208.    The SDR Group brings this cause of action against all Defendants.

209.    The DTSA provides that an owner of a trade secret that is misappropriated can bring a "civil action ... if the trade secret is related to a product or service used in, or intended for use in, interstate or foreign commerce." 18 U.S.C. § 1836(b)(1).

210.    In a civil action brought under the DTSA with respect to the misappropriation of a trade secret, a court may award "damages for actual loss caused by the misappropriation of the trade secret" and "damages for any unjust enrichment caused by the misappropriation of the trade secret that is not addressed in computing damages for actual loss;" or "in lieu of damages measured by any other methods, the damages caused by the misappropriation measured by imposition of liability for a reasonable royalty for the misappropriator's unauthorized disclosure or use of the trade secret." 18 U.S.C. § 1836(b)(3).

211.    Further, if the trade secret is willfully and maliciously misappropriated, a court "award exemplary damages in an amount not more than 2 times the amount of the damages awarded" and reasonable attorney's fees to the prevailing party. 18 U.S.C. § 1836(b)(3)(C)-(D).

212.    The SDR Group is the owner of its Trade Secrets within the meaning of 18 U.S.C. § 1839(4), including technical methods, workflows, software architectures, supplier/build plans, valuation/financing (offset) structures, and business strategies for integrating and operating a multi-sensor array (including gravity gradiometer systems) on a hybrid airship.

213.     The SDR Group derives independent economic value and commercial advantage from the SDR Group's Trade Secrets because such information is neither accessible to the public, nor of common knowledge to the competition.

214.     The SDR Group's offset valuation and integration strategy derived significant value from not being generally known, as evidenced by Lockheed's subsequent attribution of billions in offset credit to the program. Defendants used the SDR Group's offset strategy to launch a parallel commercial pathway without the SDR Group.

215.     Under the DTSA, the term "trade secrets" includes financial, business, scientific, technical, economic, and engineering information, including plans, designs, prototypes, methods, techniques, processes, procedures, programs, and/or codes, which is the type of information that comprises the SDR's Group's Trade Secrets.

216.     The SDR Group implemented reasonable measures of security to protect the SDR Group's Trade Secrets by, among other measures, executing agreements containing confidentiality provisions designed to protect and maintain the SDR Group's confidential information secret. This information included mechanical know-how concerning the interconnection of the sensors necessary to conduct the geo-surveys and how those sensors can be integrated with hybrid airships.

217.     The SDR Group's Trade Secrets are related to a product or service used in, or intended for use in, interstate or foreign commerce because it is directly tied to manufacturing airships and sensors in Puerto Rico for sale in interstate and international commerce, and the merging of geo-survey data generated by the sensors with the SDR Group's software to use integrated platforms to identify and service entire nations' natural resource AOIs at a level of resolution and depth that has not been commercially available.

218.    Defendant Dr. Boyd collaborated firsthand with the SDR Group in negotiations and the design process for the SDR Group's sensor array for the Hybrid Airship platform. He also had a role as a negotiator for the SDR Group's business, including obtaining the relevant funding. To achieve this, he was provided access to the SDR Group's Trade Secrets, including confidential business information, business plan, business model and unique technologies – with full knowledge that it was confidential, proprietary to the SDR Group, and that the latter protected it, and that he could not use it for other purposes.

219.    Despite that, Dr. Boyd co-founded $AT^2$, used the knowledge derived by working with the SDR Group to cut it out of the deal with Lockheed, and is now pursuing the same business plan and using the same confidential technologies for $AT^2$'s benefit.

220.    Mr. DiFrancesco's primary area of expertise is geophysics sensors. He was heavily involved in the creation and development of the SDR Group's sensor array for the hybrid airship platform – under the NDA for his company, Niagara. In that capacity and through his work at Lockheed, he obtained full access to the SDR Group's Trade Secrets, including the mechanical information related to its proprietary sensors. He also helped the SDR Group market its business model to potential investors (including in the USA, Qatar, and Abu Dhabi).

221.    To carry out these roles, Mr. DiFrancesco was provided access to the SDR Group's Trade Secrets, including confidential business information, plan, model, and unique technologies – with full knowledge that it was confidential and that he could not use it for other purposes.

222.    Despite that, Mr. DiFrancesco has signed an NDA with $AT^2$ and is working for the company in different capacities. Upon information and belief, this includes using the trade secrets misappropriated from the SDR Group to replicate its advanced sensor array system for the Hybrid Airship on behalf of $AT^2$.

223.        Dr. Cool became a consultant to the SDR Group and received payments from the SDR Group for his work and travel on the company's behalf. He collaborated firsthand with the SDR Group in negotiations and the design process for the SDR Group's sensor array for the Hybrid Airship platform – during which he gained access to the SDR Group's confidential information, with full knowledge that he could not use it for any other purpose. He also helped commercialize the SDR Group's business to potential investors. To carry out these roles, he was provided access to the SDR Group's Trade Secrets, business information, plan, and model and unique technologies- with full knowledge he could not use it for other purposes.

224.        Despite that, Dr. Cool misappropriated the SDR Group's Trade Secrets to establish $AT^2$, substituted the SDR Group in the business deal with Lockheed, and is now acting as CEO of this company which has replicated the SDR Group's offering.

225.        Ms. Rhodes gained access to the SDR Group's Trade Secrets and misappropriated them for $AT^2$. Upon information and belief, she is one of the founders of $AT^2$. Upon information and belief, Ms. Rhodes resigned from $AT^2$ after the company received an extrajudicial letter regarding these causes of action. However, she continues to engage and collaborate with the company in her capacity as CEO of Knight Aerospace – misappropriating the SDR Group's trade secrets in the process.

226.        The Defendants' creation, leading role, and involvement in developing $AT^2$'s business model, which is identical and/or similar to the SDR Group's in terms of technology, supply chain, marketing, overall business plan and valuation, undoubtedly demonstrates that these individuals misappropriated the SDR Group's trade secrets and confidential information. It also shows Defendants are using and continue to use the confidential information without authorization for their personal benefit and for the benefit of $AT^2$.

227.     The Defendants conspired to use improper means to misappropriate the SDR Group's Trade Secrets and confidential information. They exceeded the conditions of their authorized access and exploited the information for their personal gain.

228.     Because the nature of Dr. Boyd, Mr. DiFrancesco, Dr. Cool and Ms. Rhodes' activities with $AT^2$ will make disclosure of the SDR Group's Trade Secrets inevitable, their continued business activities with $AT^2$ constitute imminent, immediate, and irreparable harm to the SDR Group.

229.     Upon information and belief, working with insiders and as the "Dark Horse" proxy, Straightline acquired and used SDR Group's confidential diligence, supplier pipeline, and business strategy to position itself in the Hybrid Airship IP disposition while it knew or had reason to know that the information was confidential and obtained by improper means.

230.     Niagara signed the Niagara NDA with the SDR Group on March 25, 2021. Upon information and belief, Niagara is currently providing $AT^2$ confidential information and trade secrets obtained by means of the Niagara NDA both parties signed and agreed to.

231.     Through the Design Review and supplier engagement, Knight Aerospace accessed SDR Group's confidential integration and build plans and, on information and belief, used them for $AT^2$'s competing venture.

232.     $AT^2$ was formed by Dr. Boyd, Dr. Cool and Ms. Rhodes and is currently working under the leadership of Dr. Boyd and Dr. Cool.

233.     Ms. Rhodes is performing services as a contractor and, upon information and belief, Mr. DiFrancesco is working for $AT^2$ as an employee or contractor.

234.     Upon information and belief, Niagara is also providing services to $AT^2$.

235.    Upon information and belief, the Individual Defendants and Lockheed have provided $AT^2$ with trade secrets and confidential information gained, belonging, and protected by the SDR Group.

236.    Nevertheless, $AT^2$ has knowingly used that confidential information and trade secrets to launch its business and pursue the SDR Group's business plan.

237.    $AT^2$ has knowingly used and continues to use the trade secrets and confidential information misappropriated by co-defendants to replicate the SDR Group's business model and technology, and also used it to acquire the LMC Hybrid Airship IP. It has done so despite knowing that it has no right to that information and that Defendants could not share it with $AT^2$. In doing so, $AT^2$ misappropriated the SDR Group's Trade Secrets. To the degree that the remaining Defendants all signed NDAs with the SDR Group, and that the Defendants are all officers and directors of $AT^2$, the latter knew or should have known that the SDR Group's Trade Secrets were confidential.

238.    Lockheed also misappropriated the SDR Group's Trade Secrets in violation of the DTSA. Lockheed obtained access to SDR's confidential technical and business information beginning in 2016 under the terms of a *Proprietary Information Agreement* executed on Jan. 6, 2016, and through extensive, direct interactions with the SDR Group and its representatives. Lockheed acknowledged the proprietary nature of the SDR Group's sensor system, business model, valuation strategy, and airship integration plans.

239.    As further evidence of the value and competitive significance of the misappropriated trade secrets, Lockheed Martin—together with certain defendants including Dr. Boyd, Dr. Cool, and Mr. DiFrancesco—internally attributed a valuation of $3.4 billion in UAE offset credits to the Hybrid Airship-based architecture developed and disclosed by the SDR Group.

This valuation occurred only after the SDR Group operationalized the offset framework, funded Lockheed design work, and transferred proprietary models and commercial strategies under NDAs. By Fall 2019, Lockheed and its affiliated agents were pursuing a twelve-aircraft UAE program using that same framework, yielding a foreseeable offset value exceeding $20 billion. The SDR Group also provided Defendants with a plan for replicating the model globally across offset-obligee nations. The scope and magnitude of these valuations confirm the independent economic value of the SDR Group's trade secrets and demonstrate the direct harm and unjust enrichment resulting from Defendants' coordinated misappropriation.

240.    While engaged in advanced negotiations with SDR concerning the potential sale of the Hybrid Airship IP, Lockheed repeatedly encouraged SDR to share proprietary information, including sensor platform configurations, operational software integration plans, investment structures, marketing strategies, and pricing models for deployment in Puerto Rico and internationally. These disclosures were made in reliance on Lockheed's express promises of confidentiality, exclusivity, and commitment to a joint deal structure.

241.    Despite this, and while the SDR Group was operating under the belief that its exclusive negotiations remained ongoing, Lockheed began a parallel relationship with Straightline and key insiders who had worked directly with SDR—including Dr. Boyd, Dr. Cool, and Ms. Rhodes. These individuals were given access to the same confidential materials, technical data, and strategic plans developed by SDR. Upon information and belief, Lockheed shared SDR's proprietary materials with these individuals, or permitted them to exploit the information they had received while acting under confidentiality obligations to SDR.

242.    Ultimately, Lockheed transferred the Hybrid Airship IP to AT$^2$—a company formed by these very individuals—without SDR Group's knowledge or involvement. Upon

information and belief, this transaction relied in substantial part on trade secrets developed by SDR, including technical specifications, airship-sensor integration methods, and investment models first disclosed to Lockheed by SDR.

243.    Lockheed, by itself and/or through employees/agents acting within the scope of their relationship with Lockheed, acquired, disclosed, and used the SDR Group's Trade Secrets knowing or having reason to know they were obtained by improper means, including breach of confidentiality and good faith in exclusivity negotiations.

244.    Lockheed's actions facilitated and enabled the misappropriation of SDR Group's Trade Secrets, and Lockheed acted wilfully and maliciously in doing so. Lockheed improperly used SDR Group's proprietary materials to enable a separate transaction for its own benefit and the benefit of insiders, causing severe commercial harm to SDR Group.

245.    The SDR Group has sustained substantial damages as a direct and proximate result of Defendants' misappropriation of SDR Group's trade secrets and confidential information, in an amount to be proven at trial.

246.    Defendants misappropriated the SDR Group's Trade Secrets willfully and maliciously, entitling the SDR Group to recover attorneys' fees from the Defendants pursuant to 18 U.S.C. § 1836(b)(3)(D) and punitive or exemplary damages from the Defendants pursuant to 18 U.S.C. § 1836(b)(3)(C).

## II.    MISAPPROPRIATION OF TRADE SECRETS
### VIRGINIA UNIFORM TRADE SECRETS ACT, VA. CODE § 59.1-336
### (Against Dr. Boyd, Mr. DiFrancesco, Dr. Cool, Ms. Rhodes,
### Niagara, Knight Aerospace, Straightline, and AT²)

247.    Plaintiffs reallege and incorporate by reference the allegations set forth in the preceding paragraphs as if fully set forth herein.

248.    The SDR Group brings this cause of action pursuant to the Virginia Uniform Trade Secrets Act ("VUTSA"), VA. CODE § 59.1-336 et seq., against Defendants Dr. Boyd, Mr. DiFrancesco, Dr. Cool, Ms. Rhodes, Niagara, Knight Aerospace, Straightline, and AT².

249.    Under VUTSA, a "trade secret" includes information, including but not limited to technical, business, financial, and commercial information, that derives independent economic value from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use, and that is the subject of reasonable efforts to maintain its secrecy. VA. CODE § 59.1-336.

250.    The SDR Group's Trade Secrets include, without limitation, its proprietary multi-sensor integration architecture; hybrid airship build and integration plans; structured supplier stack and sequencing methodology; sovereign offset-based valuation and financing architecture; commercialization and replication strategy; pricing, forecast, and valuation inputs; and non-public supplier readiness and dependency mapping. These Trade Secrets derive independent economic value from not being generally known and are not readily ascertainable by proper means.

251.    The SDR Group implemented reasonable measures to protect the secrecy of its Trade Secrets, including executing confidentiality and limited-use agreements (including NDAs and PIAs), restricting access to need-to-know participants, marking materials as confidential, limiting disclosures to defined evaluation purposes, and utilizing secure and encrypted communication channels.

252.     Under VUTSA, "misappropriation" includes acquisition of a trade secret by a person who knows or has reason to know that the trade secret was acquired by improper means, as well as disclosure or use of a trade secret without express or implied consent by a person who used improper means to acquire knowledge of the trade secret or knew or had reason to know that the trade secret was derived from a person owing a duty to maintain its secrecy or limit its use. VA. CODE § 59.1-336.

253.     While acting as a key technical and commercial interface in SDR Group's diligence and supplier engagement, Dr. Boyd acquired access to SDR Group's Trade Secrets and used and/or disclosed those Trade Secrets, without authorization and beyond any limited-use purpose, to establish and promote AT$^2$ and to advance a competing transaction adverse to SDR Group.

254.     As a paid consultant and agent to SDR Group, Dr. Cool received confidential technical and commercial information constituting Trade Secrets and used and/or disclosed such Trade Secrets for purposes other than SDR Group's project, including to assist in the formation and advancement of AT$^2$ and to supplant SDR Group's acquisition opportunity.

255.     Pursuant to the Niagara NDA and related engagements, Mr. DiFrancesco and Niagara acquired SDR Group's Trade Secrets and, upon information and belief, used and/or disclosed those Trade Secrets to benefit AT$^2$ and related parties, exceeding authorized access and violating confidentiality and limited-use restrictions.

256.     Through the Design Review and supplier confirmation process, Knight Aerospace and Ms. Rhodes accessed SDR Group's Trade Secrets, including integration methods and build plans, and, upon information and belief, used those Trade Secrets to re-paper or redirect supplier commitments and to support AT$^2$'s competing effort, without authorization.

257.    Straightline acquired SDR Group's Trade Secrets during confidential diligence conducted under the Straightline Agreements and used or disclosed such Trade Secrets, with knowledge or reason to know of their protected status, to position itself and aligned parties in a competing disposition adverse to SDR Group.

258.    $AT^2$ knowingly acquired, used, and continues to use SDR Group's Trade Secrets obtained from the foregoing Defendants to replicate SDR Group's integrated technology platform, supplier architecture, valuation and offset strategy, and commercialization model in furtherance of a competing venture.

259.    Each of these Defendants knew or had reason to know that the information they acquired and used constituted SDR Group's Trade Secrets, as such information was disclosed under confidentiality agreements, was identified and treated as confidential, and was provided solely for limited evaluation and transaction purposes.

260.    Defendants' acquisition, use, and disclosure of SDR Group's Trade Secrets were accomplished through improper means, including breach of duties of confidentiality, breach of fiduciary duties, and unauthorized use beyond agreed limitations.

261.    Defendants' misappropriation has caused, and will continue to cause, substantial harm to SDR Group, including loss of profits, loss of business opportunities, loss of supplier relationships and pricing advantages, diminution in enterprise value, development and research costs, and unjust enrichment obtained by Defendants through use of SDR Group's Trade Secrets.

262.    Pursuant to VA. CODE § 59.1-338, SDR Group is entitled to recover damages for actual loss caused by the misappropriation and for any unjust enrichment not taken into account in computing actual loss, or in the alternative, a reasonable royalty for unauthorized disclosure or

use. To the extent the misappropriation is found to be willful and malicious, SDR Group is entitled to exemplary damages and attorneys' fees as provided by VA. CODE §§ 59.1-338 and 59.1-338.1.

## III.    ACTUAL FRAUD
### (Against Dr. Boyd, Dr. Cool, Ms. Rhodes, Mr. DiFrancesco, Lockheed, Knight Aerospace, and Niagara)

263.    Plaintiffs reallege and incorporate by reference the allegations set forth in the preceding paragraphs as if fully set forth herein.

264.    Under Virginia law, actual fraud is consists of (1) a false representation (2) of a material fact; (3) made intentionally and knowingly; (4) with the intent to mislead, (5) reliance by the party misled, and (6) resulting damage to the party misled. Fraud may also arise from the deliberate concealment or omission of material facts, where there is a duty to disclose.

265.    Fraudulent inducement occurs when a party uses deceit, including false representations or willful omissions, to induce another into a contract or business relationship. Virginia law recognizes that a promise made with a present intention not to perform constitutes a misrepresentation of present fact and is actionable as fraud.

266.    Fraud may arise not only from active misrepresentation but also from the failure to disclose material information when there is a duty to disclose, such as when one party has superior knowledge or when disclosure is necessary to prevent a partial statement from being misleading.

267.    Defendants engaged in a coordinated scheme to induce the SDR Group to remain in contractual and strategic standby—investing substantial resources in a sovereign offset-based commercialization platform, foregoing competing acquisition and financing opportunities, and maintaining exclusivity—while simultaneously planning and executing the diversion of that opportunity to vehicles aligned with Defendants.

268.    Defendants' omissions, half-truths, and affirmative misrepresentations induced SDR Group to continue investing in its program, maintain exclusivity, disclose confidential

diligence materials, and refrain from pursuing alternative strategic paths, all in reliance on representations that Defendants did not intend to honor at the time they were made.

269.    Defendants made these misrepresentations and omissions during critical phases of the parties' relationship, including: (i) Lockheed's paid design work and purported commercialization negotiations with SDR Group; (ii) Dr. Boyd's and Dr. Cool's simultaneous coordination with Straightline and $AT^2$ while holding themselves out as aligned with SDR Group; (iii) the use and redirection of SDR Group's offset architecture, valuation framework, and sensor-integration materials through Mr. DiFrancesco and Niagara; and (iv) Knight Aerospace's representations regarding continued supplier alignment while preparing to redirect commitments to $AT^2$.

270.    Representative acts of fraudulent inducement and omission include: (a) February 16–22, 2021 representations of exclusivity during APA negotiations while advancing a competing disposition; (b) concealment of Straightline's lack of financing and insider coordination; (c) failure to disclose the intent to form or align with $AT^2$ while soliciting SDR Group's confidential diligence; and (d) supplier misrepresentations regarding continued participation in SDR Group's program.

271.    Defendants acted knowingly, intentionally, and with the purpose of misleading SDR Group. Their conduct included but was not limited to: (a) presenting the illusion of a forthcoming transaction while simultaneously engineering its diversion; (b) concealing material conflicts of interest and competing plans; and (c) using SDR Group's confidential business model and proprietary materials to structure and advance a competing venture.

272.    As a direct and proximate result of Defendants' fraudulent conduct, SDR Group suffered substantial damages, including loss of its Hybrid Airship commercialization opportunity,

loss of sovereign offset-based valuation and financing advantages, loss of supplier relationships and exclusivity positions, unrecoverable diligence expenditures, and the misappropriation and exploitation of its trade secrets and proprietary business strategy.

### IV.    BREACH OF CONTRACT
### Civ. Cod. of P.R., Art. 1158, 1230, 1233, and 1255
### 31 L.P.R.A., §§ 9303, 9751, 9754, 9823
### (Against Niagara)

273.    Plaintiffs reallege and incorporate by reference the allegations set forth in the preceding paragraphs as if fully set forth herein.

274.    The contract alleged in this count—the Niagara NDA—is governed by Puerto Rico law, is expressly governed by Puerto Rico law.

275.    Each contract alleged herein satisfies Puerto Rico's contract-formation requirements—consent of the parties, a certain object, and a lawful cause—and is therefore valid and enforceable under Puerto Rico law.

276.    Under Puerto Rico law, to properly assert a claim for breach of contract, a party must sufficiently allege (1) a valid contract, (2) a breach of that contract, and (3) resulting damages.

277.    The Puerto Rico Civil Code codifies the principle of *pacta sunt servanda*, which mandates that contracts validly executed between parties have the force of law and must be fulfilled according to their terms.

278.    Additionally, Puerto Rico law imposes a duty of good faith and fair dealing in the performance and enforcement of contracts. Accordingly, a breach of contract claim may arise not only from the failure to perform an express obligation but also from actions that violate the implied duty of good faith. Furthermore, a breach of confidentiality or misuse of proprietary information could constitute a material breach if it undermines the purpose of the agreement.

279.    Niagara breached the Niagara NDA with the SDR Group, which both parties consented to and signed on March 25, 2021. The Niagara NDA is governed by Puerto Rico law and selects Puerto Rico as the judicial forum.

280.    The Niagara NDA was signed by both parties to evaluate cooperative initiatives and required the Parties to maintain the confidentiality of information disclosed, limit its use to the stated purpose, and refrain from disclosure to third parties.

281.    The Niagara NDA obligated Niagara to protect the SDR Group's confidential information and trade secrets shared under that agreement. Upon information and belief, Niagara disclosed and used such information for the benefit of AT$^2$ and others, in direct violation of the Niagara NDA.

282.    These coordinated supplier commitments were secured as part of a structured supplier-stack designed to support SDR Group's program readiness, cost validation, and offset-backed commercialization model. The execution of the Supplier LOIs occurred under the facilitation and direction of Lockheed personnel, including Dr. Boyd, who positioned himself as gatekeeper to the supplier diligence process and affirmatively encouraged confirmatory proposals in support of SDR Group's transaction.

283.    Niagara's breaches was the direct and proximate cause of SDR Group's damages, including, without limitation, lost profits and business opportunities; loss of supplier positions and pricing; diminished enterprise value; and non-recoverable diligence, design-integration, and research-and-development expenditures, in amounts to be proven at trial.

284.    The SDR Group requests (a) specific performance and injunctive relief compelling Niagara to comply with their contractual confidentiality, non-use, and cooperation obligations; (b) an order requiring the return and certified destruction of the SDR Group's confidential information

and prohibiting any further use or disclosure (including use to benefit AT[2] or any affiliate/agent); and (d) an award of contract damages (expectation and/or reliance), costs, pre- and post-judgment interest, reasonable attorneys' fees to the extent provided by the applicable agreements or otherwise permitted by law, and such other relief as the Court deems just and proper.

### V.     TORTIOUS INTERFERANCE WITH CONTRACTUAL RELATIONS
### (Against Dr. Boyd, Mr. DiFrancesco, Dr. Cool, Ms. Rhodes, Niagara, Knight Aerospace, Straightline and AT2)

285.     Plaintiffs reallege and incorporate by reference the allegations set forth in the preceding paragraphs as if fully set forth herein.

286.     Virginia law recognizes the tort of tortious interference with contractual relations as a distinct cause of action. The elements required to establish a prima facie case are: (1) the existence of a valid contractual relationship or business expectancy; (2) knowledge of the relationship or expectancy on the part of the interferor; (3) intentional interference inducing or causing a breach or termination of the relationship or expectancy; and (4) resultant damage to the party whose relationship or expectancy has been disrupted.

287.     The SDR Group maintained valid and enforceable contracts and business expectancies, including: (a) the March 25, 2021 Mutual Confidentiality and Non-Disclosure Agreement with Niagara; (b) multiple supplier Confirmation of Intention to Supply letters executed in or about April–May 2021, including the Knight LOI; (c) the 2022 NDA and Joint Venture/Bidding Framework Agreements with Straightline; and (d) exclusivity negotiations and related contractual expectations concerning the acquisition of the Hybrid Airship IP (collectively, the "Contracts and Expectancies").

288.     Each Defendant knew of the Contracts and Expectancies by virtue of his, her, or its direct involvement in SDR Group's diligence, supplier engagement, negotiations, and transaction structuring. To the extent any Defendant was not a formal party to a given contract, that Defendant

intentionally and without lawful justification interfered with the performance and integrity of that contractual relationship for the purpose of advancing a competing transaction aligned with $AT^2$.

289.　　With respect to the exclusivity negotiations and related contractual expectations concerning the Hybrid Airship IP, Defendants who were not parties to those arrangements—including Dr. Boyd, Dr. Cool, Ms. Rhodes, Mr. DiFrancesco, Niagara, Knight Aerospace, Straightline, and $AT^2$—advanced and coordinated a competing acquisition pathway, facilitated the circumvention of SDR Group's negotiated position, and diverted the opportunity to $AT^2$, thereby intentionally inducing or contributing to the impairment and disruption of SDR Group's contractual and business expectancies.

290.　　With respect to the Niagara NDA—$AT^2$, Dr. Boyd, Dr. Cool, and Ms. Rhodes intentionally induced and encouraged Niagara and Mr. DiFrancesco to use and disclose SDR Group's confidential information protected by that agreement to benefit $AT^2$, thereby causing or contributing to Niagara's breach of that contract.

291.　　With respect to the supplier Confirmation of Intention to Supply letters—$AT^2$, Straightline, Dr. Boyd, Dr. Cool, and Ms. Rhodes intentionally solicited and induced SDR Group's suppliers—including Knight Aerospace—to repudiate, re-paper, redirect, or materially impair supplier commitments previously made to SDR Group, thereby causing or contributing to the breach or substantial impairment of those supplier agreements.

292.　　Defendants' interference was intentional, improper, and without justification. It was undertaken for the purpose of misappropriating SDR Group's transaction pathway, supplier stack, offset architecture, and commercialization model for the benefit of $AT^2$ and aligned parties.

293.　　As a direct and proximate result of Defendants' interference, SDR Group suffered substantial damages, including lost profits and business opportunities, loss of supplier

commitments and pricing positions, diminished enterprise value, and unrecoverable diligence and research-and-development expenditures, in amounts to be proven at trial.

## VI.     BREACH OF FIDUCIARY DUTY
### (Against Dr. Boyd, Mr. DiFrancesco, And Dr. Cool)

294.     Plaintiffs reallege and incorporate by reference the allegations set forth in the preceding paragraphs as if fully set forth herein.

295.     Plaintiffs bring this cause of action against defendants Dr. Boyd, Mr. DiFrancesco, and Dr. Cool.

296.     Under Virginia law, a fiduciary relationship arises where one party places special trust and confidence in another, and the latter undertakes to act on the former's behalf and subject to the former's direction and control.

297.     An agency relationship exists where a principal manifests assent that the agent shall act on the principal's behalf and subject to the principal's control, and the agent consents so to act. An agent owes the principal fiduciary duties of loyalty, good faith, candor, and the duty to refrain from self-dealing, misuse of confidential information, and usurpation of business opportunities.

298.     The SDR Group designated Dr. Boyd, Mr. DiFrancesco, and Dr. Cool to act as its representatives and negotiators in dealings with Lockheed to secure the Hybrid Airship intellectual property and related Design Review engagement, and in furtherance of SDR Group's investor outreach, supplier engagement, and sovereign-offset commercialization strategy. Each Defendant accepted that designation and undertook to act on SDR Group's behalf.

299.     In that capacity, these Defendants held themselves out to third parties—including Lockheed personnel and suppliers—as acting for SDR Group; received direction from SDR Group regarding transaction structure, bidding posture, and disclosure scope; exercised influence over negotiations and supplier coordination; and were entrusted with SDR Group's confidential

business plans, valuation models, supplier sequencing and dependency mapping, integration architecture, and sovereign-offset deployment strategy. Dr. Cool received compensation and expense reimbursement from SDR Group in connection with his consultancy and agency role.

300.    By virtue of these relationships, Dr. Boyd, Mr. DiFrancesco, and Dr. Cool owed SDR Group fiduciary duties of loyalty, confidentiality, candor, and good faith, including the duty not to compete with SDR Group in connection with the Hybrid Airship opportunity, not to divert that opportunity for themselves or aligned entities, not to misuse SDR Group's confidential information, and not to act in a manner adverse to SDR Group's interests while serving as its agents.

301.    While acting within the scope of their agency and fiduciary relationships, these Defendants breached their fiduciary duties by, inter alia, (a) leveraging their agency roles and SDR Group's confidential integration, valuation, and supplier work to structure and promote $AT^2$ Aerospace as a competing venture; (b) steering the Hybrid Airship IP opportunity away from SDR Group and toward $AT^2$ while continuing to advise SDR Group; (c) inserting themselves into SDR Group's supplier diligence process—including coordinating confirmatory meetings and supplier letters of intent—and subsequently redirecting, repapering, or impairing those supplier commitments to support $AT^2$; (d) urging SDR Group to adjust or increase its bidding posture during negotiations while simultaneously promoting competing transaction pathways designed to inflate pricing and prolong negotiations; (e) using SDR Group's APA markup submitted on February 22, 2021, Design Review deliverables, and confidential diligence materials—furnished solely for evaluation of an SDR-led transaction—to advance a competing disposition adverse to SDR Group; (f) communicating through off-channel personal accounts and encrypted messaging applications to conceal coordination and move SDR Group's confidential information outside

agreed protections; and, (g) after facilitating $AT^2$'s acquisition of the IP in late 2022, attempting to sell SDR Group an equity stake in $AT^2$ at a valuation derived from SDR Group's own confidential business model and Trade Secrets.

302.    In the case of Mr. DiFrancesco specifically, he further breached his fiduciary duties by entering into arrangements adverse to SDR Group while bound by fiduciary and confidentiality obligations, and by using geophysics-sensor know-how and SDR Group's confidential integration methods obtained through his agency role to benefit $AT^2$.

303.    These acts constitute breaches of fiduciary duty under Virginia law, including self-dealing, usurpation of business opportunity, misuse of confidential information, and acting adversely to the principal while purporting to serve as its representative.

304.    As a direct and proximate result of these breaches, SDR Group lost the opportunity to acquire the Hybrid Airship IP, suffered diversion of its supplier network and commercialization pathway, incurred substantial loss of enterprise value, and sustained damages including misappropriation of confidential plans and technologies and destruction of business expectations tied to its integrated sensor-offset deployment model. SDR Group is entitled to recover compensatory damages, disgorgement of ill-gotten gains, equitable relief, and all other remedies available under Virginia law, in an amount to be proven at trial.

## VII.    DAMAGES
### (Against AT[2], Dr. Boyd, Mr. DiFrancesco, Dr. Cool, Ms. Rhodes, Niagara, Straightline, and Knight Aerospace)

305.    Plaintiffs reallege and incorporate by reference the allegations set forth in the preceding paragraphs as if fully set forth herein.

306.    This claim is pled in the alternative to Plaintiffs' statutory trade secret claims and breach-of-contract claims and is limited to conduct not displaced by applicable trade secret statutes and not duplicative of contractual remedies. This claim rests on Defendants' unfair, deceptive, and wrongful conduct independent of any contract and independent of any requirement that the information at issue qualify as a statutory trade secret.

307.    Under Virginia common law, a person who intentionally or negligently engages in wrongful conduct that proximately causes injury to another is liable for the damages caused by such conduct. Virginia law further recognizes liability for participation in unfair competition, diversion of business opportunities, misuse of confidential information, and coordinated wrongful conduct undertaken for the purpose of injuring another's business.

308.    Defendants engaged in unfair and deceptive conduct independent of contractual breaches and beyond trade-secret misappropriation, including orchestrating or assisting a phantom or proxy bidding strategy to divert the LMC Hybrid Airship IP opportunity; engaging in misleading delay tactics and dual-tracking that induced SDR Group to continue funding diligence and supplier work; re-papering and diverting supplier commitments that SDR Group had procured; and using non-trade-secret confidential and commercially sensitive information—including commercial playbooks, financing timelines, valuation posture, supplier sequencing, and relationship maps—in a manner wrongful irrespective of trade-secret status.

309.    Dr. Boyd, Mr. DiFrancesco, and Dr. Cool, while acting as SDR Group's agents and trusted advisors, used their positions to mislead SDR Group regarding the status of negotiations,

advance competing pathways, and divert business opportunities by exploiting SDR Group's non-public commercial information, including deal structure, pricing inputs, supplier readiness, and investor relationships, thereby causing foreseeable loss of the contemplated Lockheed transaction and associated enterprise value.

310.     Ms. Rhodes, while serving as Knight Aerospace's CEO and later as an $AT^2$ principal, leveraged access obtained during the Design Review and supplier diligence to align Knight Aerospace's supplier position with $AT^2$, assisted in re-papering supplier commitments away from SDR Group, and coordinated communications that advanced diversion of the opportunity.

311.     Straightline knowingly positioned itself as a proxy or "launch partner" using SDR Group's non-public pipeline and negotiations, despite lacking financing, thereby materially impairing SDR Group's supplier position and pricing and aiding in the diversion of the opportunity.

312.     Niagara used SDR Group's confidential, non-public commercial information outside permitted purposes and assisted in efforts that redirected the transaction pathway to $AT^2$, independent of any trade-secret designation.

313.     Knight Aerospace knowingly cooperated in re-aligning supplier commitments away from SDR Group and toward $AT^2$, notwithstanding its prior participation in SDR Group's diligence and program preparation, thereby participating in unfair competitive conduct.

314.     Defendants collectively appropriated and exploited SDR Group's confidential business model, supplier stack architecture, sovereign-offset structuring methodology, and commercialization pathway to position $AT^2$ in substantially the same market posture developed and funded by SDR Group.

315.    In addition to the categories of harm set forth above, Plaintiffs were deprived of a measurable and non-speculative economic opportunity whose value was confirmed by Lockheed's own internal assessments. After Plaintiffs disclosed and operationalized a sovereign offset architecture centered on the Hybrid Airship platform, Lockheed assigned the structure a valuation of $3.4 billion in UAE offset credits for two aircraft. By Fall 2019, Plaintiffs and Lockheed were pursuing an expanded UAE program of twelve aircraft using the same framework, reflecting a foreseeable value exceeding $20 billion. Plaintiffs further provided a structured plan for replicating the model across multiple offset-obligee nations. Defendants' appropriation of this commercial pathway enabled them to capture substantial value and positioning to Plaintiffs' detriment.

316.    Defendants' conduct foreseeably destroyed Plaintiffs' ability to consummate a sovereign-backed, offset-anchored transaction valued internally by Lockheed Martin at billions of dollars, causing loss of enterprise value, sunk development costs, lost sovereign-market positioning, and reputational harm.

317.    As a direct and proximate result of Defendants' wrongful conduct, SDR Group suffered damages including lost profits and business opportunities, loss of supplier commitments and pricing advantages, diminished enterprise value, non-recoverable diligence and integration expenditures, and reputational harm, in amounts to be proven at trial.

Plaintiffs seek full compensatory damages, disgorgement of unjust enrichment, pre- and post-judgment interest, costs, and such equitable relief as may be necessary to prevent further misuse of wrongfully diverted materials and opportunities.

### VIII.   COMMON-LAW MISAPPROPRIATION OF TRADE SECRETS
### Under New York Law
### (Against Lockheed)

318.     Plaintiffs reallege and incorporate by reference the allegations set forth in the preceding paragraphs as if fully set forth herein.

319.     The Lockheed Agreements with the SDR Group are governed by New York law. Accordingly, the SDR Group pleads its common-law misappropriation of trade secrets claims against Lockheed under New York law.

320.     Under New York common law, a claim for misappropriation of trade secrets requires: (1) ownership of protectable trade secrets; and (2) the defendant's use or disclosure of those secrets in breach of a duty or by improper means. Under New York law and the DTSA. the elements of a claim for misappropriation of trade secrets are fundamentally the same.

321.     In evaluating whether information constitutes a trade secret, New York courts consider several factors, including the degree to which the information is known outside the business, the extent to which it is known internally among employees or others associated with the business, the steps taken to maintain its confidentiality, the competitive value of the information to the business and its competitors, the resources invested in developing the information, and the extent to which the information could be readily obtained or replicated by others through proper means.

322.     The SDR Group owns protectable trade secrets, including without limitation: technical methods, know-how, and workflows for integrating and operating a multi-sensor array (including gravity gradiometer systems) on a hybrid airship; data-fusion and software architectures for multi-physics geo-surveying; detailed business models, valuation/financing structures (including offsets), pricing and deployment strategies; supplier identities, terms, and build plans;

and related diligence materials. These Trade Secrets derive independent economic value from not being generally known and are not readily ascertainable by proper means.

323.     The SDR Group took reasonable measures to maintain secrecy, including: marking and treating materials as confidential; executing written confidentiality agreements; restricting access to need-to-know participants; using encrypted communications; and sharing the information solely to evaluate and effect the contemplated transaction.

324.     Lockheed obtained access to Plaintiffs' Trade Secrets under the Lockheed Agreements with SDR Group and through SDR Group's funded Design Review engagement, supplier introductions, confirmatory diligence, and negotiations. The Lockheed Agreements with SDR Group and the circumstances of disclosure created a duty to keep the information confidential and to use it solely to evaluate the potential transaction with the SDR Group.

325.     Lockheed misappropriated SDR Group's Trade Secrets by using and/or permitting the use of those materials for purposes other than evaluating and consummating a transaction with the SDR Group, including: (a) dual-tracking advancing a parallel disposition of the Hybrid Airship IP with third parties who had access to the SDR Group's confidential materials—through Lockheed channels—to SDR Group's confidential materials; (b) leveraging SDR Group's technical integration work, supplier pipeline, and business/financing model to facilitate a transfer of the LMC Hybrid Airship IP away from the SDR Group; and (c) enabling insiders and counterparties to exploit the SDR Group's Trade Secrets in connection with that transfer. Upon information and belief, the disposition Lockheed ultimately pursued relied in substantial part on SDR Group's Trade Secrets and work product provided to Lockheed under obligations of confidentiality.

326.     Lockheed's conduct was without authorization, breached duties owed to the SDR Group under the SDR Group-LMC PIAs and common law and constitutes misappropriation under New York law.

327.     As a direct and proximate result, Plaintiffs have suffered and will continue to suffer damages, including lost profits and opportunities, loss of competitive advantage and enterprise value, and non-recoverable diligence, supplier, and research-and-development expenditures, in an amount to be proven at trial.

328.     The SDR Group further seeks appropriate equitable relief, including a permanent injunction prohibiting Lockheed from using or disclosing SDR Group's Trade Secrets; an order compelling return or certified destruction of all Trade Secret materials; disgorgement of profits and/or restitution attributable to the misappropriation; and, to the extent permitted by New York law on the facts proven, exemplary damages for willful and egregious misconduct.

329.     This count is pled in addition to Plaintiffs' federal claim under the Defend Trade Secrets Act, and in the alternative to any claims whose contractual remedies Lockheed disputes, without seeking double recovery.

## IX.    BREACH OF CONTRACT
### Under New York Law
### (Against Lockheed, Straightline, and Knight Aerospace)

330.     Plaintiffs reallege and incorporate by reference the allegations set forth in the preceding paragraphs as if fully set forth herein.

331.     The SDR Group-LMC PIAs, the Straightline Agreements, and the Knight Confirmation of Intention are governed by New York law. Accordingly, the SDR Group pleads its breach-of-contract claims against Lockheed and Straightline under New York law.

332.     Under New York law, breach of contract requires: (1) the existence of a contract; (2) plaintiff's performance; (3) defendant's breach; and (4) resulting damages.

333.    The January 3, 2020, and the February 20, 2020, SDR Group-LMC PIAs are binding contracts imposing confidentiality and limited-use obligations on information exchanged for the purpose of evaluating a transaction.

334.    Likewise, the Straightline Agreements constitute binding contracts under which Straightline agreed, among other things, to maintain the confidentiality of SDR Group's information, to limit use of such information to the defined transaction and joint-venture evaluation purposes, and to align its conduct with the contemplated SDR-led acquisition structure.

335.    During and in reliance on the SDR Group-LMC PIAs, the SDR Group (i) provided confidential technical and commercial information solely for the PIAs' limited-purpose evaluation; (ii) funded and completed diligence and design work; and (iii) submitted a redline of a draft APA on February 22, 2021, for confidential review. Consistent with the SDR Group-LMC PIAs, Lockheed (i) accepted and reviewed the APA markup in the parties' negotiations; and (ii) facilitated supplier diligence and engagement for the contemplated SDR-led transaction. These facts further evidence enforceability and the bargains' core protections.

336.    Similarly, in reliance on the Straightline Agreements—including the NDA executed on December 26, 2021, and the Joint Venture and Bidding Framework agreements both executed on January 14, 2022—the SDR Group shared confidential diligence materials, supplier pipeline information, and transaction strategy with Straightline for the limited purpose of exploring coordinated participation in the contemplated acquisition of the Hybrid Airship IP.

337.    On May 24, 2021, Knight Aerospace and the SDR Group executed a Confirmation of Intention to Supply letter (the "Knight LOI") in connection with SDR Group's contemplated acquisition and commercialization of the Hybrid Airship IP. The Knight LOI reflects binding obligations to cooperate in good faith with SDR Group's program, to engage in confirmatory

diligence and program preparation, and to honor confidentiality and limited-use restrictions associated with SDR Group's supplier process and Design Review engagement.

338.     In reliance on the Knight LOI, SDR Group disclosed confidential, program-specific information, supplier sequencing, integration planning, and commercialization strategy to Knight Aerospace for the limited purpose of advancing SDR Group's airship program under the contemplated acquisition structure.

339.     Knight Aerospace likewise materially breached the Knight LOI by diverting its cooperation and program readiness efforts to $AT^2$; by re-papering or repurposing supplier commitments procured through SDR Group's diligence; and by using SDR Group's confidential, program-specific information obtained during SDR Group's supplier process and Design Review engagement for a competing venture rather than for SDR Group's project as contemplated.

340.     Each agreement is supported by consideration and is valid and enforceable. The SDR Group performed, and at all relevant times stood ready, willing, and able to perform, including maintaining financing and supplier commitments in reliance on the agreements.

341.     Lockheed materially breached the SDR Group-LMC PIAs by, among other things, using and/or permitting the use of the SDR Group's confidential and trade-secret information for purposes other than evaluating a transaction with the SDR Group, including: (a) advancing a competing disposition of the LMC Hybrid Airship IP ; (b) enabling third parties to exploit the SDR Group's proprietary materials and work product obtained through Lockheed's channels; and (c) leveraging the SDR Group's integration work, supplier pipeline, and valuation/financing model outside the SDR Group-LMC PIAs' limited-use purpose.

342.     Straightline likewise materially breached the Straightline Agreements by, among other things, using or benefiting from SDR Group's confidential diligence materials, supplier

pipeline, and transaction strategy outside the limited purposes contemplated by the agreements, and by positioning itself in a manner inconsistent with the coordinated acquisition framework under which the SDR Group disclosed such information.

343.    Lockheed's, Straightline's, and Knight Aerospace's breaches were a direct and proximate cause of the SDR Group's damages, including, without limitation, lost profits and business opportunities; loss of supplier and financing positions; diminished value of proprietary information and competitive advantage; and non-recoverable diligence and research-and-development expenditures, in amounts to be proven at trial. The SDR Group also seeks pre- and post-judgment interest as allowed by law.

344.    The SDR Group seeks all remedies available under New York law, including expectation, reliance, and consequential damages, and as appropriate, equitable relief (including orders preventing further use or benefit from the SDR Group's contract-protected materials and enforcing the parties' confidentiality obligations).

### X.    BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING
#### Under New York Law
#### (Against Lockheed)

345.    Plaintiffs reallege and incorporate by reference the allegations set forth in the preceding paragraphs as if fully set forth herein.

346.    Under New York law, every contract contains an implied covenant of good faith and fair dealing, which prohibits a party from acting in a manner that destroys or injures the other party's right to receive the benefits of the agreement.

347.    The implied covenant applies to the SDR Group-LMC PIAs, which core benefit to the SDR Group was that Lockheed would use the SDR Group's confidential and trade secret

materials only to evaluate a potential transaction with the SDR Group, and not to advance others' competing efforts.

348.　　In reliance on those bargained-for benefits, the SDR Group submitted an APA markup on February 22, 2021, and undertook supplier diligence and integration work at Lockheed's direction.

349.　　Lockheed frustrated those contractual benefits by, *inter alia*: (i) dual-tracking and materially advancing a competing disposition of the LMC Hybrid Airship IP while the parties were engaged in the APA negotiation process; (ii) leveraging the SDR Group's confidential work product, APA markup (submitted February 22, 2021), supplier introductions, and diligence to divert the opportunity away from the SDR Group; and (iii) permitting or enabling use of the SDR Group's confidential materials for purposes other than evaluating a transaction with the SDR Group, thereby undermining the SDR Group-LMC PIAs' core protections.

350.　　The SDR Group performed its obligations and stood ready, willing, and able to close. Lockheed's conduct deprived the SDR Group of the fruits of the Agreements, constituting a breach of the implied covenant.

351.　　Lockheed exploited Plaintiffs' confidential offset materials to obtain sovereign approvals and internal valuations while frustrating the agreements' core purpose (evaluation of Plaintiffs' acquisition of the Hybrid Airship IP) and leveraging those materials beyond the permitted use.

352.　　As a direct and proximate result, the SDR Group suffered damages, including lost profits and business opportunities, loss of supplier and financing advantages, diminished value of proprietary information and competitive position, and non-recoverable diligence and research-and-development expenditures, in amounts to be proven at trial.

353.     The SDR Group seeks all remedies available under New York law, including contract damages (expectation and/or reliance, as appropriate), pre- and post-judgment interest, costs, and such equitable relief as may be necessary to prevent further benefit from, or misuse of, materials protected by the agreements.

354.     This claim does not seek to add or vary the express terms of the SDR Group-LMC PIAs, but targets bad-faith conduct that frustrated SDR Group's contractual benefits.

## XI.     BREACH OF DUTY TO NEGOTIATE IN GOOD FAITH
### Under New York Law
### (Against Lockheed)

355.     Plaintiffs reallege and incorporate by reference the allegations set forth in the preceding paragraphs as if fully set forth herein.

356.     Under New York law, where parties enter a binding preliminary commitment (Type II), they assume a mutual commitment to negotiate together in good faith toward a definitive agreement.

357.     Whether such a preliminary undertaking exists turns on the parties' intent—shown by their words and deeds—including: (1) the language of the writing; (2) the context of negotiations; (3) the number and importance of open terms; (4) partial performance; and (5) whether the type of deal is ordinarily reduced to a formal writing.

358.     On February 16, 2021, Lockheed and the SDR Group reached a binding Type II preliminary commitment—evidenced by contemporaneous emails and the parties' course of dealing—under which they agreed to negotiate in good faith toward a definitive Asset Purchase Agreement for the Hybrid Airship IP while completing confirmatory diligence. In reliance, the SDR Group promptly submitted an APA redline on February 22, 2021, and undertook supplier and design-integration work at Lockheed's direction; Lockheed received and used the APA markup and facilitated supplier engagement for the contemplated transaction.

359.        Lockheed's bad faith did not begin in 2021. As alleged above, beginning in 2019 and continuing through 2020, Lockheed's AERO leadership undertook a deliberate effort to undermine and redirect the offset-backed transaction pathway that it had previously endorsed, laying the groundwork for the later exclusivity manipulation and diversion.

360.        Lockheed breached its duty to negotiate in good faith by, among other things: (i) dual-tracking and materially advancing a competing disposition of the Hybrid Airship IP during the negotiation window; (ii) leveraging the SDR Group's confidential diligence, APA markup, supplier pipeline, and design work to divert the opportunity away from the SDR Group; and (iii) failing to engage honestly and consistently with the agreed good-faith process.

361.        The SDR Group performed its obligations and, at all relevant times, was ready, willing, and able to finalize the APA. Lockheed's bad-faith conduct deprived the SDR Group of the benefit of a fair negotiating process and caused foreseeable loss.

362.        As a direct and proximate result, the SDR Group suffered reliance damages, including diligence and negotiation costs, supplier-development and integration expenses, financing and transaction costs, lost opportunity costs attributable to the good-faith negotiation commitment, and diminution in the value of work product prepared for the Lockheed transaction, in amounts to be proven at trial. The SDR Group also seeks pre- and post-judgment interest as permitted by law.

363.        This claim is pled in the alternative to contract-based theories. If the Court concludes no binding preliminary (Type II) agreement existed, the SDR Group pleads promissory estoppel in the alternative based on Lockheed's clear and unambiguous promises inducing reasonable, foreseeable reliance during the APA process.

### XII.    PROMISSORY ESTOPPEL
**Under New York Law**
**(Against Lockheed)**

364.    Plaintiffs reallege and incorporate by reference the allegations set forth in the preceding paragraphs as if fully set forth herein.

365.    Under New York law, promissory estoppel requires a clear and unambiguous promise, reasonable and foreseeable reliance by the party to whom the promise is made, and an injury sustained by reason of that reliance.

366.    In or about February 2021, Lockheed made clear, unambiguous promises in the course of the APA negotiations, including that it would (a) proceed in good faith toward a definitive APA using SDR Group's submitted APA markup; (b) continue the APA process while SDR Group completed confirmatory diligence and supplier onboarding at Lockheed's direction; and (c) use SDR Group's confidential diligence and design-integration work solely for the contemplated transaction with SDR Group. (To be conformed to the documents and emails.)

367.    SDR Group reasonably and foreseeably relied on these promises by, among other things, submitting its APA redline on February 22, 2021; undertaking supplier engagement and letters of intent; funding and performing design-integration and diligence work at Lockheed's direction; maintaining financing readiness; and reallocating personnel and resources away from other opportunities. Lockheed failed to honor these promises and instead leveraged SDR Group's APA markup, diligence, and supplier pipeline while materially advancing a competing disposition of the Hybrid Airship IP with third parties.

368.    In reliance on Lockheed's representations and negotiation course, the SDR Group paid millions for a Hybrid Airship geo-survey Design Review and sensor ROFRs that Lockheed used to advance and value the offset instrument. The SDR Group's reliance was foreseeable because Lockheed adopted the SDR Group's structure and assigned it a $3.4B credit value.

369.     As a direct and proximate result, SDR Group suffered reliance damages, including diligence, negotiation, supplier-development, design-integration, financing and transaction costs, and lost opportunity costs, in amounts to be proven at trial.

370.     This claim is pled in the alternative to SDR Group's Type-II preliminary-agreement claim. To the extent any statute-of-frauds defense is asserted, enforcement is necessary to avoid injustice given SDR Group's substantial, foreseeable reliance and resulting injury.

## XIII.   UNJUST ENRICHMENT
### Under New York Law
### (Against Lockheed)

371.     Plaintiffs reallege and incorporate by reference the allegations set forth in the preceding paragraphs as if fully set forth herein.

372.     Unjust enrichment claims in New York require a plaintiff to demonstrate that the defendant was enriched, the enrichment occurred at the plaintiff's expense, and it would be against equity and good conscience to allow the defendant to retain the benefit. If the trier of fact finds that no enforceable contract governs the particular benefits Lockheed obtained, or that Lockheed's enrichment falls outside the scope of any such contract, equity and good conscience require restitution.

373.     Lockheed was enriched by, *inter alia*, using Plaintiffs' confidential diligence, supplier pipeline/introductions, valuation and financing structures, Design Review work product, and APA redline to pursue a disposition of the Hybrid Airship IP adverse to Plaintiffs, while avoiding the costs Plaintiffs incurred to generate those materials.

374.     Lockheed received a concrete economic benefit—reduction of sovereign offset liabilities—by appropriating the SDR Group's offset instrument (valued by Lockheed at $3.4B for two aircraft) and routing it to $AT^2$; equity requires disgorgement measured at least by the offset value attributable to Plaintiffs' contributions, plus consequential and reliance losses.

375.    The enrichment was at Plaintiffs' expense, including non-recoverable diligence, integration, supplier, and R&D expenditures and the diversion of the business opportunity.

376.    In equity and good conscience, Lockheed should not retain that benefit without compensating the SDR Group.

377.    Plaintiffs seek restitution/disgorgement in an amount to be proven at trial. This claim is pled in the alternative and is not duplicative of Plaintiffs' contract or tort claims.

### XIV.   PERMANENT INJUNCTION
### To prevent any actual or threatened misappropriation of
### the SDR Group's Trade Secrets
### (Against All Defendants)

378.    Plaintiffs reallege and incorporate by reference the allegations set forth in the preceding paragraphs as if fully set forth herein

379.    Plaintiffs bring this cause of action against Defendants AT$^2$, Dr. Boyd, Mr. DiFrancesco, Dr. Cool, Ms. Rhodes, and Lockheed.

380.    Each Defendant is properly subject to injunctive relief because each has possessed, used, disclosed, or benefited from the SDR Group's Trade Secrets and confidential information, and absent injunctive relief such misuse will continue through AT$^2$'s ongoing commercialization activities.

381.    The violations described above have caused—and will continue to cause—the SDR Group irreparable harm that cannot be fully compensated by money damages absent injunctive relief.

382.    Plaintiffs request that the Court issue an injunction prohibiting Defendants, and all persons in active concert or participation with them who receive actual notice of the injunction, from: (a) using, disclosing, transmitting, or otherwise exploiting the SDR Group's confidential information and Trade Secrets; (b) retaining, copying, or failing to return any documents, data,

media, or devices containing the SDR Group's confidential information and Trade Secrets, and requiring the immediate return or certified destruction of the same; (c) soliciting, including, or facilitating any third party's use of the SDR Group's confidential information and Trade Secrets, including for the benefit of Lockheed, AT$^2$, Straightline, Knight Aerospace, and Niagara and any of their employees or contractors; (d) interfering with the SDR Group's existing or prospective contractual and supplier relationships through the use or disclosure of the SDR Group's confidential information and Trade Secrets; and (e) requiring Defendants to provide a sworn accounting identifying all persons or entities to whom the SDR Group's confidential information and Trade Secrets have been disclosed, and to submit written certifications of compliance with the Court's order.

383.    The SDR Group is without an adequate remedy at law because the Defendants continue to use and disclose the SDR Group's Trade Secrets and have refused to commit that they will not do so.

384.    Accordingly, the SDR Group should be granted temporary, preliminary, and permanent injunctive relief against the Defendants to prevent any actual or threatened misappropriation of the SDR Group's Trade Secrets pursuant to 18 U.S.C. § 1836(b)(3)(A) and P.R. Laws Ann. tit. 10, § 4136, and the Court's inherent equitable powers.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs Sustainable Development Resources, LLC and Quantum Earth, LLC (the "SDR Group") respectfully request that the Court enter Judgment in their favor and against all Defendants, jointly and severally where permitted by law, and award the following relief:

a) Compensatory damages, including reliance and expectation damages, in an amount to be determined at trial but believed to exceed **$4.25 billion**, including the value of the SDR Group's misappropriated trade secrets and confidential commercial information and the loss of the sovereign-backed Hybrid Airship commercialization program—an opportunity internally valued by Lockheed at approximately **$3.4 billion for the initial UAE tranche**, together with the loss of enterprise value and related commercial opportunities associated with the SDR Group's platform and sovereign financing architecture;

b) Disgorgement and/or restitution of any unjust enrichment and, where appropriate, the imposition of a constructive trust;

c) Exemplary or multiple damages where authorized by law (including 18 U.S.C. § 1836(b)(3)(C) and P.R. Laws Ann. tit. 10, § 4137);

d) Reasonable attorneys' fees where authorized by statute, contract, or rule;

e) Allowable costs, expert witness fees, and litigation expenses where authorized by statute, contract, or rule;

f) Temporary, preliminary, and permanent injunctive relief as necessary to prevent actual or threatened misappropriation and other ongoing harm;

g)  An Order requiring the return and/or certified destruction of the SDR Group's confidential and trade-secret materials in Defendants' possession, custody, or control;

h)  Pre- and post-judgment interest as permitted by law; and

i)  Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiffs Sustainable Development Resources, LLC and Quantum Earth, LLC demand a trial by jury on all issues contained herein.

Dated: March 5, 2026

Respectfully submitted,

**GILBERT LLP**

*/s/ Wellford Hunter Winstead*
WELLFORD HUNTER WINSTEAD
Virginia Bar Number: 66770
700 Pennsylvania Avenue, SE
Suite 400
Washington, D.C. 20003
Telephone: (202) 772-2344
Facsimile: (202) 772-3333
Email: WinsteadH@GilbertLegal.com

/s/ Matthew M. Lavin
Matthew M. Lavin
Matthew M. Lavin (pro hac vice pending)
lavinm@gilbertlegal.com
700 Pennsylvania Ave. SE, Suite 400
Washington, DC 20003
Telephone: 202.772.2200
Fax: 202.772.3333

NAPOLI SHKOLNIK

*/s/ Hunter J. Shkolnik*
HUNTER J. SHKOLNIK (PRO HAC VICE PENDING)
Hunter@nsprlaw.com

*/s/ Nestor D. Galarza*
NESTOR D. GALARZA (PRO HAC VICE PENDING)
NGalarza@nsprlaw.com

**NS PR LAW SERVICES**
1302 Avenida Ponce de León
Santurce, PR 00907
Tel: (787) 493-5088
Fax: (646) 843-7603

*/s/ Salvatore C. Badala*
SALVATORE C. BADALA (PRO HAC VICE PENDING)
**NAPOLI SHKOLNIK, PLLC**
400 Broadhollow Road, Suite 305
Melville, NY 11747
Tel: (212) 397-1000
SBadala@napolilaw.com

*/s/ Shayna E. Sacks*
SHAYNA E. SACKS  (PRO HAC VICE PENDING)
**NAPOLI SHKOLNIK, PLLC**
360 Lexington Avenue, 11xth Floor
New York, NY 10017
Tel: (212) 397-1000
SSacks@napolilaw.com

*Counsel for Plaintiffs*